**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| WORLD FINANCIAL GROUP, INC., ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION** |
| ) | **FILE NO.:** _____ |
| FREEPOINT, LLC; FREEPOINT ) | **1 04-CV 0553** |
| WEALTH MANAGEMENT INC.; ) | |
| COLIN BRIAN BUCKINGHAM; ) | **CAP** |
| STEVEN EDWARD RIX; and DOES ) | |
| 1-10 ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff World Financial Group, Inc. ("Plaintiff" or "WFG") makes and

files this Verified Complaint for Damages and Injunctive Relief against

Defendants Freepoint, LLC ("Freepoint"), Freepoint Wealth Management, Inc.

("Freepoint Wealth"), Colin Brian Buckingham ("Buckingham"), Steven Edward

Rix ("Rix"), and Does 1 through 10 ("Does") (collectively "Defendants") for

wrongful activity in connection with the raiding of WFG's agents, tortious

interference with WFG's business relationships, engaging in unfair trade practices,

the theft and misappropriation of WFG's trade secrets, the infringement of WFG's copyrights and the breach of certain Associate Membership Agreements by Buckingham, Rix and Does with the encouragement, assistance and consent by Freepoint and Freepoint Wealth.

In support of these claims, WFG states as follows:

## The Parties

1.      Plaintiff WFG is a corporation, duly formed and existing under the laws of the State of Delaware.  Currently, and at all times relevant to this Complaint, WFG's principal place of business has been located at 11315 Johns Creek Parkway, Duluth, Fulton County, Georgia 30097.  Thus, at all relevant times, WFG has been and continues to be a citizen of the States of Delaware and Georgia.  WFG is a marketing company providing global strategic concepts and advice to persons engaged in the development of insurance products and marketing programs.  In conjunction with its affiliated broker-dealer, World Group Securities, Inc. ("World Group Securities"), and other affiliated companies, WFG offers life insurance and additional financial products and services.  WFG offers these products and services through an extensive network of independent contractor representatives operating under contracts with WFG and its affiliated companies.

WFG is a member of the AEGON Group ("AEGON Group"), and one of the world's leading life insurance, pension and related financial services organizations.

2.      Upon information and belief, defendant Freepoint is a limited liability company, duly formed and existing under the laws of the State of Arizona, and, at all times relevant to this Complaint, Freepoint's principal place of business has been 1723 W. Blue Ridge Way, Chandler, Arizona 85248.  Thus, at all relevant times, Freepoint has been and continues to be a resident and citizen of the State of Arizona.  Service of the Summons and Complaint may be made upon Freepoint via its registered agent, Colin Buckingham, at 1723 W. Blue Ridge Way, Chandler, Arizona 85248.  Upon information and belief, Freepoint is a holding company for Freepoint Wealth, and participates in and controls the activities of Freepoint Wealth.

3.      Upon information and belief, defendant Freepoint Wealth is a corporation, duly formed and existing under the laws of the State of Arizona, and, at all times relevant to this Complaint, Freepoint Wealth's principal place of business has been 4110 N. Scottsdale Road #306, Scottsdale, Arizona 85251. Thus, at all relevant times, Freepoint Wealth has been and continues to be a resident and citizen of the State of Arizona.  Service of the Summons and Complaint may be made upon Freepoint Wealth via its registered agent, Colin

Buckingham, at 1723 W. Blue Ridge Way, Chandler, Arizona 85248. Similar to WFG, Freepoint Wealth is a broad-based insurance marketing and financial services company, operating in the United States and worldwide through a network of insurance agencies and independent brokers. Upon information and belief, Freepoint Wealth has entered into a selling agreement with a company called USAllianz Securities ("USAllianz"), a broker-dealer and direct competitor of WFG and WFG's broker-dealer affiliate, World Group Securities. Upon further information and belief Freepoint Wealth, directly and through its relationship with USAllianz and other entities and individuals, including Defendants Buckingham and Rix, has begun to or will engage in business activities which are directly competitive to those of WFG, including business of developing, marketing and selling insurance, mortgage and other financial products and services.

4.    Defendant Buckingham is an individual who, at all times relevant to this Complaint, has resided at 1723 W. Blue Ridge Way, Chandler, Arizona 85248. Thus, at all relevant times, Buckingham has been and continues to be a resident and citizen of the State of Arizona and may be served with process by personal service. Buckingham is the founder, President, CEO and sole shareholder of both Freepoint and Freepoint Wealth and, upon information and belief, is an independent marketing associate of Freepoint, Freepoint Wealth and USAllianz.

Further, Buckingham was formerly an independent contractor Associate with WFG pursuant to the terms of an Associate Membership Agreement. At the time of his termination from WFG Buckingham held the field title of Marketing Director for WFG. In this capacity, Buckingham had the responsibility for supervising and received override commissions of the business production of those other "downline" Associates in his business hierarchy.

5. Defendant Rix is an individual who, at all times relevant to this Complaint, has resided at 207 N. Gilbert Road, Suite 210-F, Gilbert, Arizona 85234. Thus, at all relevant times, Rix has been and continues to be a resident and citizen of the State of Arizona and may be served with process by personal service. Upon information and belief, Rix is currently an independent marketing associate of Freepoint, Freepoint Wealth, and USAllianz. Further, Rix was formerly an independent contractor Associate with WFG pursuant to the terms of an Associate Membership Agreement. At the time of his termination from WFG Rix held the field title of Marketing Director for WFG. In this capacity, Rix had the responsibility for supervising and received override commissions of the business production of those other "downline" Associates in his business hierarchy.

6. At this time, WFG is ignorant of the true names and capacities of defendants sued herein under the fictitious names Does. Upon information and

belief, Does are residents and citizens of the United States who participated in the acts alleged herein and are responsible in some manner for the injuries and damages to WFG as alleged herein.

**Jurisdiction and Venue**

7.    This Court has jurisdiction over the Defendants because they transact business within this state, committed a tortious act within this state, and/or caused a tortious injury within this state.  Specifically, Buckingham and Rix agreed, in the Associate Membership Agreements ("AMA") with WFG that each executed, that the Georgia federal courts shall have exclusive jurisdiction of any litigation between the them and WFG and expressly submitted to the jurisdiction of this Court.  (AMA § IX ¶ K.)  They also acknowledged and agreed that significant aspects of the performance of the AMA would occur in the State of Georgia.  (Id.) Similarly, Freepoint and Freepoint Wealth, acting in concert with and through Buckingham and Rix, have transacted business within this state, committed a tortious act within this state, or caused a tortious injury within this state. Jurisdiction is additionally proper pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a) and 1338(b).

8.    The amount in controversy in this action exceeds $75,000.  The injunctive relief that Plaintiff seeks is valued at more than $75,000.  The business

interests, customer contacts, good will, and trade secrets that Plaintiffs seek to protect through the restrictive covenants at issue herein are worth well in excess of the jurisdictional minimum.

9.      Venue of this action lies in this Court pursuant to the parties agreement in the AMAs and 28 U.S.C. § 1391.

## Background Information

### I.    The Business of WFG and its Associate Membership Agreements

10.     WFG is a marketing company that is dedicated to serving the financial needs of individuals and families from all walks of life who are often overlooked by other members of the financial services industry.  WFG is comprised of a field force network of independent contractor associates/representatives (the "Associates") driven by the company's mission to help people around the world achieve financial independence.

11.     Both Defendants Buckingham and Rix were previously Associates with WFG.

12.     Just as is the case with all Associates of WFG, Buckingham and Rix are each a party to an Associate Membership Agreement ("AMA") with WFG.[1]

---

[1]     In May 2001, WFG entered into an Agreement with World Marketing Alliance, Inc. ("WMA") and its broker-dealer affiliate, WMA Securities, Inc. ("WMAS"), to purchase certain assets.  As part of that Agreement, all of the rights, title and interests which WMA had in the

True and correct copies of the AMAs, with attachments including a Glossary and Explanation of Terms, are attached hereto as Exhibits 1 and 2 and are fully incorporated herein.

13.     The AMAs between WFG and its Associates, and specifically those executed by Buckingham and Rix, contain certain terms and restrictive covenant conditions which are material terms of the agreements and of the relationship between each of said Defendants and WFG.  Specifically, the AMA for each of said individual Defendants contains restrictions on a) inducing customers of WFG to terminate or replace their WFG-provided products and services, b) recruiting other members of WFG, c) inducing other members of WFG to breach their own AMA, and d) disclosing confidential information or trade secrets of WFG.  (AMA § II ¶ N and Glossary ¶ D.)

14.     With respect to inducing customers to replace their WFG products and services with products of a third party, both Buckingham and Rix agreed specifically that they would:

> not, at any time during the term of this Agreement, and
> for a period of two (2) years thereafter, directly or
> indirectly, individually or in concert with another, induce
> or attempt to induce any Customer to terminate, reduce
> coverage under or replace any of the Products and

---

AMAs with its Associates were transferred to and assumed by WFG.  This specifically included all of the rights, title and interests in the AMAs executed by Defendants Buckingham and Rix.

> Services which have been sold by the Associate or
> his/her Downline Associates.  In this Section [], the term
> "Customer" shall be limited to those Customers (i) to
> whom the Associate and his/her Downline Associates
> sold Products and Services; and (ii) who reside, at the
> time of the inducement or attempted inducement, in the
> geographical area within fifty (50) miles of the location
> of the Associate's office(s) during the eighteen (18)
> month period preceding Termination of this Agreement.

(Glossary ¶ D2 and AMA § II ¶ N.)

    15.    With respect to recruiting other members of WFG, both Buckingham

and Rix specifically agreed that they would:

> not, at any time during the term of this Agreement, and
> for a period of two (2) years thereafter, directly or
> indirectly:  (i) induce or attempt to induce any person
> who is contractually affiliated with [WFG] as an
> Associate or in other capacity, or any member of
> [WFG's] administrative staff, to terminate their
> relationship with [WFG]; or (ii) hire, induce or attempt to
> hire or induce any such persons to sell or solicit products
> and services which are competitive with the Products and
> Services for any person or entity other than [WFG].  The
> Associate's covenant in the preceding sentence are
> limited and only apply with respect to any person that
> resided in or engaged in business activities in the
> geographic area within fifty (50) miles of the location of
> the Associate's office(s) during the eighteen (18) month
> period preceding Termination of this Agreement.

(Glossary ¶ D3 and AMA § II ¶ N.)

    16.    Buckingham and Rix further acknowledged in executing the AMAs

that any attempt to solicit any member of WFG's network of contractually-

affiliated associates constitutes "wrongful interference with [WFG's] contractual relationship with such persons and with [WFG's] and the Preferred Companies' administrative staffs." (Id.)

17.    With respect to inducing other members of WFG to breach their own AMA with WFG, both Buckingham and Rix specifically acknowledged and agreed that:

> all members of WFG's network of contractually affiliated sales associates/representatives have executed agreements with [WFG] containing covenants identical or similar to the Covenants and that any act by the Associate to induce or attempt to induce any member to breach any portion of his/her agreement with [WFG] would constitute wrongful interference with the contractual rights of [WFG] with such member.

(Glossary ¶ D6 and AMA § II ¶ N.)

18.    Both Buckingham and Rix further specifically acknowledged and agreed that any attempt by an Associate to induce other Associates to breach their AMA with WFG would result in "extremely costly and irreparable harm, loss and damage" to WFG. (Id.)

19.    With respect to disclosing WFG's trade secrets or confidential information, both Buckingham and Rix agreed specifically that they would:

> not use, disseminate or reveal, other than on behalf of [WFG] as authorized by [WFG] or the Preferred Companies, while this Agreement is in force, or within

> two (2) years after Termination of this Agreement, any
> confidential information or trade secrets of [WFG] or of
> the Preferred Companies, which the Associate has or
> hereafter receives, including any Customer or list of
> [WFG] Associates, whether obtained from [WFG] or any
> other person, or compiled by or on behalf of the
> Associates; ... . The Associate agrees that immediately
> upon the Termination of this Agreement he/she will
> return all documents, files and lists containing
> confidential information or trade secrets to [WFG] and
> the same shall not be copied or duplicated.

(Glossary ¶ D4 and AMA § II ¶ N.)

20.    Both Buckingham and Rix specifically agreed that they would not

violate any of the aforementioned restrictive covenants.  (AMA § II ¶ N.)

21.    Finally, the AMA explicitly provides and Buckingham and Rix agreed

that WFG may seek equitable relief, including injunctive relief and specific

performance, in the event the Associate breaches any of the covenants above.

Specifically, the parties agreed that any actual or threatened violation of these

covenants would result in irreparable injury to the WFG for which there may be no

adequate remedy at law since the property rights protected are unique assets not

subject to easy replacement.  (Id. § VI and Glossary ¶ D7.)

## II.    Defendants' Actions To Violate The AMAs, Unfairly Compete And Tortiously Interfere With WFG's Business, And Infringe On WFG's Copyrights

22.    Buckingham officially resigned from WFG on or about June 10, 2003.

23.    Rix officially resigned from WFG on or about November 7, 2003.

24.    Upon information and belief, commencing at least several months prior to the respective resignations of Buckingham and Rix from WFG, Defendants, acting in concert with each other, developed and carried out a plan to establish a business venture which would be similarly structured to WFG and which would engage in many of the same business activities and offer some of the same products as WFG and its affiliates.  All of Defendants' actions were conducted "behind the scenes" and without the knowledge or consent of WFG.

25.    On or about February 20, 2003, Freepoint was established as a limited liability company under the laws of Arizona.  Defendants established Freepoint for the purpose of utilizing its limited liability company structure to establish and conduct their improper business venture.

26.    On or about December 31, 2003, Freepoint Wealth was incorporated as an Arizona corporation.  Defendants incorporated established Freepoint Wealth for the purpose of utilizing its corporate structure to establish and conduct their improper business venture.

27.    Upon information and belief, Freepoint is a holding company for Freepoint Wealth.  Buckingham is the registered agent with the Arizona Corporation Commission for both entities.  Additionally, they share the same

website: www.freepoint.us/freepoint.htm.  Notably, Defendants' website utilizes similar or identical descriptions of their "vision" and business activities to that originally prepared by and utilized by WFG.  For example, Defendants' website describes their business and "vision" by stating that Freepoint is a different kind of company in the financial services industry today – a marketing company that is "dedicated to serving the financial needs of individuals and families from all walks of life" and "helping individuals and families who have been overlooked by other companies in the financial services industry," imitating, and in some instances copying verbatim, the language used by WFG on its website and in its marketing literature.

28.     Freepoint and Freepoint Wealth, directly and in conjunction with selling agreements with other companies, market and provide insurance products, mortgage products, securities and other investment products that are similar to, if not the same as, those marketed and offered by WFG and its affiliates. Additionally, Freepoint and Freepoint Wealth target the same consumers as WFG.

29.     Freepoint Wealth offers investment securities to its customers through its contractual relationship with USAllianz, which serves as the broker-dealer to Freepoint Wealth for this purpose.

30.    As part of Defendants' scheme to unfairly compete and tortiously interfere with WFG's business, Defendants have improperly taken and utilized certain confidential information and trade secrets belonging to WFG.

31.    For example, upon information and belief, the business visions, concepts, structure and operations of Freepoint and/or Freepoint Wealth, including the hierarchial business structure, marketing and distribution of their products and services and the compensation system, are closely based on the confidential and proprietary information and trade secrets of WFG.

32.    Further, Defendants copied verbatim and are utilizing an Associate Membership Agreement identical in language and form to the AMA agreement utilized by WFG.  A true and correct copy of Freepoint/Freepoint Wealth's "Associate Membership Agreement" ("Freepoint's AMA") is attached hereto as Exhibit 3 and is fully incorporated herein.  Defendants are utilizing this agreement to recruit people, most notably people who are or have been Associates of WFG, to become Associates of Freepoint.

33.    Defendants have gone so far in their attempts to improperly recruit WFG Associates to leave WFG and its broker-dealer affiliate (World Groups Securities, which is also known and referred to as "WGS") and join Freepoint/Freepoint Wealth (and Defendants broker-dealer affiliate USAllianz) as

to prepare a document entitled "Steps to Start Enrollment for Freepoint." In this document Defendants provide step-by-step instructions on how to **"send [their] letter of resignation to World Financial Group and to World Group Securities."** The document further states, in pertinent part, that applicants

> want to be signed up to sell Allianz fixed products while is [sic, "in"] transition with your U4/U5 so **it is important to do the following steps prior to submitting for resignation with WFG/WGS.** You can sign up to sell Allianz fixed products through a marketing organization and Freepoint is a marketing field organization. **This is noted as an outside business activity with WGS, so an OBA form should be filled out with the BOM if the transition will take a while due to personal desire to wait for current or past commissions to be paid through WFG.**

(Emphasis added). Defendants go even further in the document to advise recruits how to apply for registration with USAllianz and that "Allianz will contact you (or Freepoint, and then Freepoint will contact you) to give you their website" and **USAllianz will "monitor the NASD website for your U5 to switch over your license to Allianz from WGS."** (Emphasis added). A copy of the document entitled "Steps to Enrollment for Freepoint" ("Freepoint Enrollment List") is attached hereto as Exhibit 4 and is fully incorporated herein.

34.    Defendants have also prepared a form resignation letter for use in resigning from WFG and World Group Securities and have distributed this letter

with the Freepoint Enrollment List to WFG Associates whom they are recruiting. A copy of the form resignation letter is attached hereto as Exhibit 5 and is fully incorporated herein.

35.     Defendants have been engaged in activities to solicit and recruit Associates within the WFG organization to terminate their contracts with WFG and its broker-dealer affiliate, World Group Securities, and to join the new business venture being established by Defendants.  Upon information and belief, Defendants have communicated with numerous WFG Associates who were part of their respective downline hierarchies and possibly the hierarchies of other WFG Associates, all of whom were parties to AMA contracts with WFG, about their plans.

36.     Specifically, and by way of example only, upon  information and belief, Defendants solicited Tom Bauer and Jim Bramlet away from WFG and induced them to breach their AMAs.  Both Bauer and Bramlet associated with Freepoint and Freepoint Wealth (and their affiliated broker-dealer, USAllianz) the same month they left WFG and WGS.  Further, both Bauer and Bramlet are now Senior Vice Presidents of Freepoint and/or Freepoint Wealth.

37.     By way of further examples, upon information and belief, Defendants also solicited Nathan Merrill, Andraya Carson and Eric Tormala to leave WFG and

join Freepoint, Freepoint Wealth, USAllianz.  In doing so, Defendants induced

Merrill, Carson and Tormala to breach their AMA with WFG.

38.     Upon information and belief, Defendants are not only actively

soliciting and recruiting the individuals named above and other WFG Associates to

terminate their AMAs and relationships with WFG, but are encouraging and

enticing these people to solicit and recruit still other WFG Associates to do the

same.

39.     Upon information and belief, the above examples represent only a

portion of the efforts which have been made and which are continuing to be made

by Defendants to recruit and solicit the employees and Associates of WFG and its

affiliates to terminate and breach their AMAs with WFG and to join the

Defendants and/or their affiliated companies or others with which they have

business relationships.

40.     The conduct of Defendants, individually and collectively, has caused

and will continue to cause WFG and its affiliates irreparable harm for which WFG

and its affiliates have no adequate remedy at law.

41.     Defendants have unique knowledge of WFG's structure, development,

procedures, policies, products, training, and marketing.  Further, Defendants seek

and continue to recruit other WFG Associates with unique knowledge of WFG's

structure, development, procedures, policies, products, training and marketing to leave WFG and join Defendants.

42.     The Defendants have actively solicited WFG Associates and induced or attempted to induce these Associates to breach their AMA with WFG. Defendants will continue to raid WFG Associates unless ordered to stop.

43.     Accordingly, under the applicable laws and parties' agreements, WFG is entitled to entry of a temporary and permanent injunction, as well as actual damages, against Defendants and any other persons or entities acting in concert with Defendants, from inducing or benefiting from Defendants' breach of the non-disclosure, non-recruiting, non-solicitation and non-interference restrictive covenants of the AMAs.

44.     Upon information and belief, Defendants have also violated, induced violation or interfered in the performance of the customer non-replacement provisions of the AMAs on numerous occasions.

45.     Upon information and belief, defendants have solicited and will continue to actively solicit WFG's customers to terminate or replace their WFG products and services.  These actions directly violate the express, complete and unambiguous terms of the AMAs and the applicable laws.

46.     The conduct of Defendants, individually and collectively, has caused and will continue to cause WFG and its affiliates irreparable harm for which WFG and its affiliates have no adequate remedy at law.

47.     Accordingly, under the applicable law and parties' agreements, WFG is entitled to entry of a temporary and permanent injunction, as well as actual damages, against Defendants, as well as any other persons or entities acting in concert with, inducing or benefiting from Defendants' breach of the customer non-replacement provisions of the AMA and other applicable laws.

48.     In addition to these unjustified and improper acts of competition, theft and interference, Defendants have infringed on WFG's copyrighted materials.

49.     As mentioned above, Defendants have copied and reproduced verbatim the WFG AMA, replacing only the company name with that of Freepoint, Freepoint Wealth and/or Freepoint, LLC in the Freepoint AMA.

50.     The WFG AMA is subject to copyright protection and bears the copyright symbol.  On or about February 20, 2004, WFG filed for copyright registration of the AMA with the United States Copyright Office.

51.     The WFG AMA was an original works of authorship owned by WFG to which Defendants had access and copied and/or reproduced in identical form and substance.

52.   Similarly, Defendants copied verbatim several paragraphs from WFG's website as Defendants' statement of their vision.  The home page of WFG's website contains the following paragraphs:

> World Financial Group is one of the few companies of its kind in the industry – a marketing company that is dedicated to service the financial needs of individuals and families from all walks of life.
>
> World Financial Group's independent associated do not just work with clients who have large amounts of discretionary income – instead they work with everyday people helping them make critical financial decisions that move them from where they are to where they want to be.
>
> WFG associates are committed to:
> - Helping individuals and families who are overlooked by other companies in the financial services industry.
> - Working with clients to create a strategy to protect themselves and their families if they live too long or die too soon.
> - Educating individuals, families and business owners that financial decisions made today are critical in determining their financial futures.
>
> Unlike other insurance and financial service companies that offer products and services from a single provider, World Financial Group associates represent a number of the industry's leading companies, not just one, to the consumer.  This approach helps WFG associates find the product that fits you and your needs, rather than fitting you into a product.

And a page describing the services offered by WFG contains the following paragraphs:

Although we live in the Information Age, the lack of education about financial concepts is astonishing. People know they need to take steps to save for retirement, plan for life's emergencies and save for major expenses like college and buying a home – but they simply don't do it because they don't know how or where to start.

Consider these facts:

- The U.S. Government estimates the Social Security program will experience permanent cash deficits beginning in 2017, when many Baby Boomers will begin retirement.
- The median income reported by older Americans in 2000 was $13,769.
- Only 4 percent of retirees have saved enough and have enough income to have achieved financial independence.
- 35 percent of workers ages 20 to 39 believe they are on track in planning and saving for retirement. However, of this same group, 43 percent have less than $10,000 in retirement savings and 58 percent have saved less than $25,000.

As you can see, a tremendous need exists for financial education and assistance. As a World Financial Group associate, you can help be part of the solution. You can learn how to help people just like you get on track to their financial goals and better prepare for their future.

True and correct copies of these web pages are attached hereto as Exhibit 6 and are fully incorporated herein.

53.    Defendants' website copies these paragraphs verbatim as the first six paragraphs of their "Freepoint Vision" page, changing only "World Financial

Group" to "Freepoint" and "Associates" to "Planners."  A true and correct copy of The Freepoint Vision web page is attached hereto as Exhibit 7 and is fully incorporated herein.

54.    As with the AMAs, all the content on WFG's website is subject to copyright protection and bears the copyright symbol.  On or about February 20, 2004, WFG filed for copyright registration of its website with the United States Copyright Office.

55.    These paragraphs on WFG's website were original works of authorship owned by WFG to which Defendants had access and copied and/or reproduced in identical form and substance.

56.    Accordingly, under the applicable laws, WFG is entitled to a temporary, preliminary and permanent injunction, as well as a recovery of WFG's actual damages and Defendants' profits for this infringement.

**III.    Prior Notice to Freepoint Wealth, Freepoint, Rix and Buckingham**

57.    WFG became aware of some of Rix and Buckingham's actions in or about late-2003.  In November 2003, WFG sent cease and desist letters to Rix and Buckingham.  True and correct copy of the cease and desist letters to Rix and to Buckingham are attached hereto as Exhibits 8 and 9, respectively, and are fully incorporated herein.

58.     Upon information and belief, Freepoint, and Freepoint Wealth (because of Buckingham's positions as Founder, CEO, President and sole shareholder) were also put on notice as to the wrongful activity of the Defendants via the cease and desist letter to Buckingham.

59.     Defendants are fully aware of the AMA between WFG and its Associates (including the individual defendants), and yet they continue to associate, solicit, recruit, engage and do business with WFG's Associates that violates the terms of the AMA and induces and promotes further breaches of the AMAs.

60.     Despite receipt of the cease and desist letters from WFG, and despite knowledge of their own misconduct and unlawful behavior, Defendants continue to engage in said conduct in violation of WFG's rights and interests.

61.     The wrongful conduct of the Defendants has caused, and will continue to cause, WFG and its affiliates irreparable harm for which WFG and its affiliates have no adequate remedy at law.

62.     Accordingly, WFG is entitled to entry of a temporary and permanent injunction, as well as actual damages, against Defendants, and other persons or entities acting in concert with or benefiting from Defendants' wrongful conduct.

## Count I - Breach of Contract by Buckingham and Rix

63.     Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.     Buckingham and Rix (and possibly Does) each entered into the AMA, a valid and binding contract, with WFG.

65.     The terms of the AMA are clear, definite, certain and complete, and the written document contains the essential elements of the engagement.

66.     Pursuant to the terms of these contracts, Buckingham and Rix each agreed, during the term of the AMA and for two years thereafter, as follows:  (a) not to induce any other member of WFG or staff to terminate their relationship with WFG; (b) not to recruit WFG members or staff to sell any product or service or to join any other insurance or financial services entity that is competitive with WFG and its products and services; (c) not to use, disseminate or reveal any confidential information or trade secrets of WFG; and (d) not to solicit or induce WFG customers to terminate or replace their WFG-provided products and services.

67.     WFG has performed all its obligations under the AMAs.

68.     Upon information and belief, Buckingham and Rix (and possibly Does) have each breached, and will continue breaching, the AMA by using,

-24-

disseminating or revealing confidential information and trade secrets to Freepoint and Freepoint Wealth (and their affiliated entities) and to others.

69.     Upon information and belief, the individual defendants (and possibly Does) have each repeatedly breached, and will continue breaching, the AMAs by soliciting and recruiting WFG members to affiliate with Freepoint and Freepoint Wealth (and their affiliated entities), which are entities competitive with WFG selling competing products and services.

70.     Upon information and belief, Buckingham and Rix (and possibly Does) have each repeatedly breached, and will continue breaching, the AMAs by soliciting and inducing WFG customers to terminate or replace their WFG-provided products and services.

71.     Pursuant to Section VI of the AMA, WFG is entitled to, among other remedies, injunctive relief restraining the individual defendants from any further breach of the contractual obligations owed to WFG as described in this Complaint.

72.     As a direct and proximate result of the individual defendants' breaches of the AMA, WFG has further been damaged in an amount to be proven at trial.

## Count II - Breach of Fiduciary Duty and Duty of Loyalty by Buckingham and Rix

73.     Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74.     Buckingham and Rix (and possibly Does) have an implied good faith duty not to take any action that would impair or destroy the value of WFG. This duty incorporates the prohibition against self-dealing, the duty not to compete with WFG while still associated with WFG and for a specified time thereafter, and the duty not to engage in actions that would harm WFG.

75.     Upon information and belief, Buckingham and Rix did provide while still associated with WFG, are now providing, and will continue to provide during the specified time after the termination of their association with WFG, to Freepoint and Freepoint Wealth (and their affiliated entities), and to others, certain confidential information and trade secrets belonging to WFG. These defendants have also wrongfully solicited other WFG Associates to leave and compete with WFG and to breach their own AMAs. The individual defendants have also, upon information and belief, engaged in this conduct while still associated with WFG or its affiliated companies. Each of these constitutes a breach of their implied duty to WFG.

76.     Pursuant to Section VI of the AMA, WFG is entitled to, among other remedies, injunctive relief restraining Buckingham and Rix (and possibly Does)

from any further breach of their implied duties owed to WFG as described in this Complaint.

77.    As a direct and proximate result of Buckingham's and Rix's (and possibly Does') breaches of their implied duties, WFG has further been damaged in an amount to be proven at trial.

## Count III - Misappropriation Of Trade Secrets Pursuant To O.C.G.A. § 10-1-760, et seq., And Common Law

78.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 77 of this Complaint as if fully set forth herein.

79.    Upon information and belief, Defendants provided or induced others to provide certain marketing concepts, compensation programs, entity structure information, training information and/or customer and member lists to the corporate defendants.  This information, which upon information and belief Defendants are utilizing, constitute trade secrets under common law and § 10-1-760, et seq. of the Georgia Code as WFG derives actual and potential economic value by virtue of their secrecy and makes all reasonable efforts to maintain this secrecy.

80.    Upon information and belief, the individual defendants and other Associates solicited by Defendants actually provided these trade secrets to the Defendants.  Further, the Defendants solicited these trade secrets from the

individual defendants and other Associates solicited by Defendants, or induced the individual defendants and other Associates solicited by Defendants to provide the trade secrets. This conduct occurred without consent, express or implied, of WFG.

81. Upon information and belief, at the time of disclosure and use, Defendants knew, or had reason to know, that the individual defendants and other Associates solicited by Defendants owed a duty to WFG to maintain the secrecy and limit the use of these trade secrets.

82. Therefore, Defendants' past, and threatened future, use of these marketing and business concepts, customer/member lists and other confidential and proprietary information constitutes misappropriation of trade secrets under common law and § 10-1-760, et seq. of the Georgia Code.

83. Defendants' acts of threatened and actual misappropriation have caused, and will continue to cause, WFG to suffer imminent and irreparable injury, for which it has no adequate remedy at law, which entitle WFG to injunctive relief. WFG is also entitled to injunctive relief pursuant to § 10-1-762 of the Georgia Code.

84. As a direct and proximate result of Defendants' threatened and actual misappropriation of trade secrets, WFG has further been damaged in an amount to be proven at trial.

## Count IV - Tortious Interference With Contract and/or Business Relations

85.   Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.   Valid contracts exist between WFG and their Associates, employees and other agents.

87.   Upon information and belief, Defendants have solicited, and will continue to solicit, these Associates, employees and other agents to breach their contracts, or otherwise not continue their current or any future business relationship, with WFG.

88.   Defendants' actions have been without privilege or legal justification.

89.   Defendants' actions have been purposeful and with malice and intent to injure WFG.

90.   Defendants' actions have damaged Plaintiff WFG in an amount to be proven at trial.

## Count V - Common Law Unfair Competition

91.   Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.   Defendants' acts described above constitute common law unfair competition in violation of Georgia law and other applicable law.

93.    Defendants' acts of common law unfair competition have been and are knowing, intentional, and willful.

94.    Defendants' acts of common law unfair competition are causing WFG to suffer irreparable harm, for which they have no adequate remedy at law, and have damaged WFG in an amount to be determined at trial.

## Count VI - Common Law Raiding

95.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 94 of this Complaint as if fully set forth herein.

96.    Defendants are competing with WFG.

97.    Defendants, within a short period of time, have hired or attempted to hire many WFG Associates, particularly those in the Southeast and West regions and in Buckingham's and/or Rix's downline hierarchy, which constitutes raiding.

98.    Defendants committed or attempted to commit this raid of WFG's Associates by improper means, such as encouraging, soliciting and condoning breaches of fiduciary duty, breaches of contact, misappropriation of trade secrets and confidential information.  Defendants knowingly accepted the benefits of this conduct.

99.    Defendants actions were intentional and with malice, and were designed to cause harm to WFG.

100.    As a result of Defendants' raiding of WFG's Associates, WFG has suffered and will continue to suffer a severe loss of production from these regions and the specific downlines.

101.    Defendants' acts of raiding have been caused, will continue to cause, WFG to suffer imminent and irreparable injury, for which it has inadequate remedy at law, which entitle WFG to injunction relief.

102.    As a direct and proximate result of Defendants' threatened and actual raiding, WFG has been damaged in an amount to be proven at trial.

### Count VII - Federal (17 U.S.C. § 101, et seq.) And/Or Common Law Copyright Infringement

103.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104.    WFG's AMA and website are both items of original authorship fixed in a tangible medium of expression.

105.    The AMA and the website materials are owned by WFG and were registered with the United States Copyright Office on or about February 20, 2004.

106.    Defendants have intentionally copied and/or reproduced WFG's AMA and portions of its website verbatim as their own agreement and website content.

107.    Such copying and/or reproduction was not authorized or consented to by WFG.

108.   As a result of this verbatim and willful infringement, WFG has suffered damages, including lost relationships with its Associates, lost business and revenue from these relationships, and lost existing and potential customers.

109.   Defendants' acts of copyright infringement are causing, and will continue to cause, WFG to suffer irreparable harm, for which WFG is entitled to an injunction and monetary damages, including WFG's actual damages and Defendants' gains, profits and advantages from the infringement in an amount to be proven at trial.

WHEREFORE, Plaintiff WFG hereby prays that this Court enter an Order:

A.   Granting judgment in favor of WFG on all of its causes of action;

B.   Temporarily, preliminarily and permanently enjoining Defendants from using or disclosing any of WFG's trade secrets and confidential and proprietary information in contravention of the AMA and applicable laws;

C.   Temporarily, preliminarily and permanently enjoining Defendants from soliciting or recruiting any employee or agent of WFG or any of its affiliates to work for any of the Defendants or for any other person or entity associated with Defendants who is involved in the

distribution of insurance products in any state or territory of the United States;

D.     Temporarily, preliminarily and permanently enjoining Defendants from hiring, engaging or soliciting any WFG Associate to join or otherwise share information with Defendants;

E.     Temporarily, preliminarily and permanently enjoining, in accordance with the AMAs, Buckingham and Rix (and possibly Does) from soliciting any of WFG's Associates to breach their contracts with WFG;

F.     Temporarily, perliminarily and permanently enjoining, in accordance with the AMAs, Buckingham and Rix (and possibly Does) from soliciting or inducing any of WFG's customers to terminate or replace their WFG-provided products and/or services;

G.     Temporarily, preliminarily and permanently enjoining Does from using, reproducing or otherwise displaying WFG's copyrighted materials, including the Associate Marketing Agreement ("AMA") and language from WFG's website;

H.     Awarding WFG its actual compensatory damages in an amount proven at trial as judgment against all Defendants;

I.  Awarding WFG its actual damages and Defendants' gains, profits and advantages from the infringement in an amount to be proven at trial as judgment against all Defendants;

J.  Awarding WFG, as judgment against Defendants, pre-judgment and post-judgment interest, as allowable;

K.  Awarding WFG, as judgment against Defendants, its costs of suit incurred herein, including reasonable attorneys' fees; and

L.  For such other and further relief as this Court deems just and proper.

Respectfully submitted this 27th day of February 2004.

HUNTON & WILLIAMS LLP

Scott M. Ratchick
Georgia Bar No. 595136
Shanon J. McGinnis
Georgia Bar No. 387598


Bank of America Plaza, Suite 4100
600 Peachtree Street, NE
Atlanta, Georgia  30308
Phone:   404-888-4000
Fax:      404-888-4190

Counsel for Plaintiff
World Financial Group, Inc.

# WORLD MARKETING ALLIANCE, INC.
## Associate Membership Agreement

**THIS AGREEMENT** is made by and between **WORLD MARKETING ALLIANCE, INC.** (hereinafter referred to as "WMA"), and the undersigned individual (hereinafter referred to as the "Associate").

**WHEREAS**, the Associate desires to become a member of WMA's sales force (hereinafter referred to as "World Marketing Alliance" and further defined herein) which will be composed of a group of independent contractors ("members") who enter into agreements with WMA pursuant to which they become authorized to engage in the business of selling insurance and other financial service Products and Services offered by WMA; and

**WHEREAS**, WMA has established a contractual relationship with one or more companies (collectively, the "Preferred Companies", or individually, a "Preferred Company") authorizing WMA or the members of "World Marketing Alliance" to market and sell various Products and Services and to recommend and designate members of "World Marketing Alliance" for appointment with the Preferred Companies as independent sales representatives with respect to such various Products and Services; and

**WHEREAS**, WMA is continually recruiting new members to "World Marketing Alliance" and desires to have the Associate become a member of "World Marketing Alliance" by entering into a written agreement with the Associate which establishes and defines the terms and conditions of the Associate's membership in "World Marketing Alliance";

**NOW, THEREFORE**, in consideration of the premises, the mutual promises and covenants in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, and intending to be legally bound hereby, WMA and the Associate agree as follows:

## I. Membership in "World Marketing Alliance"

**A.** The Associate hereby agrees to become a member of "World Marketing Alliance" and to abide by the terms and conditions of membership as hereinafter set forth in this Agreement.

**B.** There are two (2) types of members in "World Marketing Alliance": Dedicated and Non-Dedicated. Dedicated members are those persons who have made a decision to market for sale only those Products and Services marketed by WMA. Non-Dedicated members are those persons who have made a decision to market the Products and Services and other products and services not marketed by WMA. Although the membership terms of Dedicated and Non-Dedicated members will be identical in some respects, Dedicated members will be accorded certain benefits not available to Non-Dedicated members. Such benefits are described in Associate Agreement Rules and Guidelines as published from time to time by WMA.

The Associate hereby elects to be a Dedicated member or a Non-Dedicated member as indicated on the signature page of this Agreement.

## II. Associate's Duties As A Member

**A.** As a member of "World Marketing Alliance" the Associate promises that he/she will do the following:

1. Use his/her best efforts to sell and promote the sale of the Products and Services;
2. If a Dedicated member, not be involved or associated in any manner with any hierarchial sales organization of any kind in which commissions are paid based on multi-generational levels;
3. If a Dedicated member, not market or sell any products or services other than the Products and Services;
4. If a Non-Dedicated member, Associate agrees to disclose and notify WMA in writing as to the general nature of Associate's involvement and/or affiliation with any other business or company.
5. Not market or sell any products or services to any member or prospective member of World Marketing Alliance;
6. Preserve the good name and reputation of "World Marketing Alliance" and WMA and not do anything that will damage the name and reputation of "World Marketing Alliance" or WMA;
7. Comply with all rules and guidelines set forth in the Associate Agreement Rules and Guidelines and the WMA Manual, either now existing or as issued from time to time by WMA;
8. Comply with all of the terms and conditions of any contract(s) into which Associate enters with WMA, the Preferred Companies, or any companies with which WMA is or may hereafter become affiliated, directly, indirectly, through common ownership, by contractual agreement, or otherwise ("WMA Affiliated Companies"). For purposes of this Agreement, any reference hereinafter made to WMA shall be deemed to constitute a reference to all of the WMA Affiliated Companies;
9. Participate in the training that will be provided to "World Marketing Alliance";
10. Refrain from selling or soliciting for sale any Products and Services that require licensing or registration of a Preferred Company until the Associate receives written notice from WMA or the Preferred Company that the Associate has been approved to market such Products and Services; and
11. Execute such further agreements and obtain such licenses that WMA determines to be required for the Associate to be lawfully authorized to sell any of the Products and Services.
12. Diligently fulfill supervisory responsibilities with respect to Downline Associates.

**B.** The Associate understands and acknowledges that WMA is in the business of selling ... "World Marketing Alliance" to provide Products and Services to the ... ing public and "World Marketing Alliance" is a ... ble issuer WMA of the Associate acknowledges that WMA owns all rights in and to the following: (i) "World Marketing ... iance", which, for purposes of this Section II.B., includes all persons who have in force independent contractor agreements with WMA and all such agreements; (ii) the identities of and all lists of the members comprising "World Marketing Alliance"; and (iii) the identities of and all lists of the customers produced by "World Marketing Alliance" ("Customers") (even though the Associate may not have recruited any of the members or produced any of the Customers) which constitute property owned solely by WMA. Associate agrees that Associate shall have no proprietary interest in, or ownership of, any Customers, other Associates of WMA including Downline Associates, or Products and Services. WMA shall have exclusive proprietary interest in, or ownership, of all Customers, and contractual relationships with other Associates and the Preferred Companies.

**C.** As a member of "World Marketing Alliance", the Associate is not an employee of WMA or "World Marketing Alliance". Instead, the Associate's relationship with WMA is that of an independent contractor. Nothing in this Agreement shall be construed to constitute the Associate as a partner, employee or agent of WMA, nor shall WMA, the Preferred Companies or the Associate have any authority, except as expressly provided herein, to bind the other, it being the intention that each shall remain an independent contractor responsible for his/her own actions. Subject to all applicable local, state and federal laws and regulations, this Agreement, Associate Agreement Guidelines and Rules, the WMA Manual, and any contract(s) between the Associate and the Preferred Companies, the Associate shall conduct and control his/her business activities, work hours, selection of customers, office location and sales methods. Even though a state license or form may designate the Associate as an "employee" of WMA or the Preferred Companies, such designation will not change the fact that by definition and by practice the Associate is an independent contractor. As an independent contractor, the Associate shall be responsible for paying any and all federal, state, city or other taxes that may become payable with respect to any compensation the Associate may receive under the terms of this Agreement

**D.** Associate shall promptly pay all expenses relating to the performance of Associate's duties under this Agreement including but not limited to indebtedness to WMA and premium costs of errors and omissions insurance required by WMA. Associate shall be solely responsible for all of his/her expenses, including but not limited to travel, entertainment, office, signs, telephone, education dues, subscriptions, licenses, etc., and shall receive no remuneration or reimbursement of any nature whatsoever other than the commissions referred to herein. Company shall not provide any facilities, furniture, or equipment to Associate. Associate shall provide his/her own office, telephone, supplies, transportation and all other facilities which Associate may deem necessary

**E.** Associate shall supervise the WMA-related activities of Associate's Downline Associates and use Associate's best efforts and continuing diligence in directing Associate's Downline Associates to comply with their respective associate membership agreements with WMA and in training and providing assistance to Associate's Downline Associates all in accordance with WMA policies and procedures, including those contained in the Associate Agreement Rules and Guidelines. Associate's fulfillment of such supervisory and training responsibilities is an essential requirement of Associate's compliance with this Agreement.

**F.** Associate shall, as required to sell Products and Services, be duly licensed in each jurisdiction in which and from which Associate solicits, offers or obtains applications and orders for purchase of Products and Services and in each jurisdiction where required by law, in which and from which Associate receives Override Compensation. Associate will bear the cost of ... initial and renewal fees for licensing and registrations. Associate will make payment as instructed by WMA

**G.** Associate shall maintain accurate and current records of all transactions entered into pursuant to this Agreement. Such books and records shall conform to the requirements of federal and state laws, the rules and regulations of appropriate regulatory agencies and the policies and procedures of WMA and of Associate's branch office to which Associate reports. Associate shall maintain an accurate and current file of all commission statements and other records and correspondence received from WMA and notify WMA in writing within thirty (30) days after receipt thereof if such statements, records and correspondence, or any of them, is inconsistent with Associate's records or, in the opinion of Associate, not accurate. As to any statements, records or correspondence furnished by or on behalf of WMA to Associate, if Associate does not furnish WMA with written objections or corrections within thirty (30) days of mailing by WMA, then Associate shall be deemed to have approved such statements, records and correspondence as to any matter not objected to or corrected, and to have released WMA from liability and responsibility for all matter contained therein.

**H.** Associate shall not use sales material of any kind which has not been approved in writing by WMA for such use, including but not limited to any type of form letter or correspondence. Without the prior written approval of WMA, Associate shall not use any form of media, including but not limited to radio, newspaper, television, letters, business cards, letterhead, or photocopies, to promote sales. The Associate promises not to use the name "World Marketing Alliance" in conjunction with any notation indicative of a business organization, such as "Corporation", "& Company", "Ltd.", "Inc." or "& Associates", unless the Associate is specifically granted written permission from WMA to do so. The Associate may not appropriate the name "WMA" or "World Marketing Alliance" for use in any corporate name, joint venture or partnership.

**I.** All activities conducted by Associate under this Agreement shall be conducted in accordance with all applicable laws. Associate also has the duty to faithfully abide by the rules and regulations set forth in the Associate Agreement Rules and Guidelines that may be issued from time to time, the WMA Manual, as amended from time to time, and all bulletins or memoranda issued by the Preferred Companies. Associate shall immediately advise WMA of any action or fact whatsoever which comes to Associate's knowledge which may possibly constitute a violation of any applicable laws or regulations with respect to WMA, Associate or any party who is, has been, or may be doing business with WMA. The Associate's failure to comply with, or failure to cause his/her Downline Associates to comply with, any Associate Agreement Rule constitutes a material breach of this Agreement.

**J.** WMA has contracted with one or more insurance companies to provide WMA and its independent contractors with group plans for errors and omissions and fidelity insurance coverage. Associate is required to participate in these group plans and monthly insurance premiums will be deducted by WMA from commissions due to Associate. If Associate's commissions are insufficient

to cover the monthly insurance premiums, then WMA shall have the right to direct any WMA Affiliate to offset such deficit against any earned commissions due to Associate, or, at the option of WMA, Associate may be billed for the total amount of accrued insurance premiums and such amount will be paid in full by Associate within 15 days of the billing date, otherwise this Agreement will be terminated. WMA specifically reserves the right to modify insurance premiums charged without prior notice.

K.   Associate shall not take, undertake or engage, directly or indirectly, in any Prohibited Actions

L.   Associate acknowledges and agrees that all supplies, including but not limited to prospectuses, memoranda, visual aids, specimen plan forms, manuals, statistical and sales training and/or recruitment materials, vendor materials and brochures, furnished by WMA to Associate are and shall be the property of WMA and shall be returned promptly to WMA upon demand.

M.   Associate shall comply with the terms, conditions and restrictions on use contained in any and all license or other contractual agreements between third party owners of any computer software and WMA or any WMA Affiliate, pursuant to which WMA or a WMA Affiliate has obtained the right to use such computer software.  Associate further agrees to comply with the terms of any license or other contractual agreement into which Associate is required to enter with any third party computer software owner.

N.   Associate shall not violate the Covenants

## III.  Associate's Compensation

A.   The Associate acknowledges and understands that the Associate earns income only from the sale of the Products and Services and no income is earned by or paid to Associate for recruiting.  The Associate's sole compensation under and during the term of this Agreement shall be commissions paid by, or caused to be paid by, WMA pursuant to this Agreement and paid in the manner provided in, and subject to the terms and conditions contained in, those Associate Agreement Guidelines and commission schedules which are published by WMA from time to time.  The Preferred Companies are generally not obligated to pay the Associate any money.  There is no guarantee that the Associate will be financially rewarded solely by virtue of becoming a member of "World Marketing Alliance".

B.   WMA will publish Associate Agreement Guidelines and commission schedules from time to time which relate to sales position designations, performance standards, commission rates of WMA or the Preferred Companies and other matters affecting the terms of the members' compensation.  WMA may, from time to time, in the exercise of its sole discretion, and without notice, increase or decrease the rates and amounts of commissions or the sales position of Associate; provided, however, that any such changes may be prospective only, but may affect any new business and any commissions earned thereafter on existing business.

C.   Associate acknowledges and agrees that Associate's commissions are a share of WMA's commissions and Associate's commissions are earned by, and shall be payable to, Associate only after all of the following have occurred: i) the order or application for Products and Services submitted by Associate is accepted and approved by WMA or a Preferred Company at its principal office, or by an approved WMA designee; ii) actual payment for the same has been made by and received from the Customer, and iii) WMA has actually received payment from a Preferred Company, if applicable, of WMA's commission is subject to WMA's refund rights set forth in Section III. G. of this Agreement.

D.   Any money and value owed by Associate to WMA, any Debit Balance, and any money and value which has been advanced or credited by or on behalf of WMA or a WMA Affiliate to, or for the benefit of, Associate, represents a loan and may be offset and deducted by WMA from any commissions or other money or value then or thereafter owed by WMA to Associate.  WMA is hereby authorized by Associate to deduct from commissions due the amount of any commissions paid to Associate in connection with any payment or amount that WMA refunds to Associate's Customer.

E.   All Debit Balances shall be repaid immediately by Associate upon notice thereof to Associate by WMA or a WMA Affiliate.  Any Debit Balances not paid within thirty (30) days from the effective date of such notice shall bear interest from the end of such thirty (30) days at a rate equal to the maximum legal rate of interest provided by applicable law.  From time to time in its sole discretion, WMA or a WMA Affiliate may cause a reduction in all or any portion of the Associate's Debit Balance in any of the following ways: i) by applying any commissions or other forms of compensation payable to the Associate by WMA or a WMA Affiliate to reduce the Associate's Debit Balance; or ii) by exercising any other legal rights and remedies available to WMA or a WMA Affiliate, including any rights or remedies that are included in Associate Agreement Guidelines and Rules.  The Associate is also obligated to repay WMA or WMA Affiliates for the Debit Balances of any of Associate's Downline Associates.  If a Downline Associate does not pay his Debit Balance either after ninety (90) days from the effective date of notice by WMA or a WMA Affiliate to Downline Associate, or immediately upon termination of that Downline Associate's Associate Membership Agreement with WMA or other contractual agreement with a WMA Affiliate, then that Downline Associate's Debit Balance, and the interest and other liabilities in connection therewith, shall Roll Up to Associate and become in all respects part of Associate's Debit Balance for which Associate and such Downline Associate shall be jointly and severally liable for payment to WMA or a WMA Affiliate.

F.   Except as otherwise provided in this Agreement, and subject to the terms of this Section III. F., if and when Associate qualifies for and attains certain sales position designations established by WMA from time to time pursuant to Associate Agreement Guidelines, Associate shall become Vested and entitled to receive commissions upon the termination of this Agreement for any reason, unless and until Divestiture occurs.  However, Associate acknowledges and agrees that since Associate's commissions are a share of WMA's commissions, Associate shall, upon becoming Vested, be vested in commissions only to the extent that WMA actually receives commissions with respect to the applicable Customers from the Preferred Companies.  In the event that Associate, at the time of Termination of this Agreement, has not qualified and attained the sales position designation(s) established by WMA as a condition to becoming Vested, Associate shall have no right to commissions or any compensation of any kind.

further agrees to promptly repay WMA all commissions by Associate with respect to any returns to Customers and WMA is hereby
authorized to deduct from any other commissions due or that may become due to Associate hereunder, the amount due WMA for
any such expenses or commissions to be repaid by Associate.

**H.** Except as set forth above in Sections III.A. and III.F., Associate shall receive no other compensation of any kind
whatsoever under this Agreement. Associate will not receive any fringe benefits under this Agreement whatsoever, including but
not limited to insurance benefits, disability income, paid vacation, expense reimbursement or retirement benefits unless otherwise
specifically provided for in this Agreement.

## IV. Term and Termination

**A.** This Agreement shall continue in effect until Termination

**B.** Upon the Termination of this Agreement, all commissions by Associate prior to the effective date of Termination of this
Agreement shall be paid by WMA to Associate within a reasonable period of time. Except for commissions which Associate may
become entitled to receive if Associate becomes Vested in accordance with Section III F. of this Agreement, no further
compensation, other than the commissions earned as of the effective date of Associate's Termination, shall be payable to Associate
under this Agreement after Termination. However, WMA or any WMA Affiliate shall have the right to offset against any
commissions, any Debit Balance, indebtedness owed by Associate to WMA or to any WMA Affiliate, or any charges made by
WMA or a WMA Affiliate to Associate occasioned by improper activity, etc. Upon Termination of this Agreement, any Debit
Balances then or thereafter outstanding, and any Debit Balances that may thereafter exist, shall without notice immediately become
due and payable and shall bear interest at the highest rate permitted under applicable law until paid. Associate shall promptly
surrender to WMA all books and records relating to WMA including but not limited to all applications and payments which
Associate may have in his/her possession or under his/her control at the time of Termination.

## V. Arbitration of Grievances

The Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved
exclusively by Good Faith Arbitration. For purposes of this Article V, the terms "Party" and "Parties" include WMA, the Associate
and the Corporate People.

## VI. Extraordinary Relief

The Associate acknowledges that WMA would suffer extremely costly and irreparable harm, loss and damage if any of the
provisions of this Agreement are violated by the Associate. The Associate agrees that WMA shall be entitled to seek Extraordinary
Relief to temporarily enjoin violations by the Associate of this Agreement and that WMA may seek Extraordinary Relief in the
federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good
Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article
V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral power regarding Extraordinary
Relief.

## VII. Associate's Promise to Indemnify and Assign

**A.** The Associate agrees to indemnify and hold harmless from and against any and all Indemnified Losses which are
incurred, sustained, suffered, or assessed against the Indemnified Party, or all or any combination thereof, because of, arising out
of or as a result of any acts or omissions, including but not limited to a breach of Section II N. or any breach of Associate's
contract(s) with Preferred Companies, by the Associate and also any of Associate's Downline Associates. The Indemnified Party
shall be entitled to use counsel of its own choosing, shall be entitled to determine the validity of the Indemnified Loss and shall not
be required to notify the Associate of the existence or progress of any claims or Indemnified Loss as a condition precedent to
requiring payment by the Associate to the Indemnified Party for an Indemnified Loss.

**B.** To secure the Associate's promise of indemnification and the Associate's obligation to repay his/her Debit Balance or
his/her Downline Members' Debit Balances, the Associate hereby assigns to WMA, and grants, and agrees to, from time to time
execute any additional instruments or documents necessary to perfect, a continuing security interest to WMA in, all commissions
(or advances thereon) otherwise payable to the Associate by WMA, to the extent necessary to satisfy WMA for any such Indemnified
Loss or any such Debit Balance obligations. This assignment is given to WMA to secure the Associate's obligations as set forth
above and elsewhere in this Agreement. WMA has the right to withhold commissions in connection with this indemnity.

## VIII. Representations and Warranties

**A.** The Associate expressly represents and warrants that the Associate has the authority to enter into this Agreement and
that the Associate is not and will not, by virtue of entering into this Agreement and consummating the transactions contemplated
thereby, or otherwise, be in breach of, violate, or interfere with, any other contract, agreement, or business relations which the
Associate has or had with any third party, company, agency, association, firm, person, corporation, or other entity.

**B.** Associate has not engaged in nor will engage in any business practice or behavior nor has taken nor will take any action
which has or will result in any violation of any restrictions or covenants to which the Associate is subject pursuant to any agreement
to which the Associate was heretofore a party.

## IX. Miscellaneous

**A.** All capitalized terms used but not otherwise defined herein shall have the meaning set forth in that certain Glossary and Explanation of Terms published by WMA and in effect as of the date of this Agreement, a copy of which Associate acknowledges receipt. The Glossary and Explanation of Terms are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Any changes to the Glossary and Explanation of Terms shall be effective as of the date of general publication by WMA.

**B.** If any term of this Agreement controverts the express, or in the opinion of WMA's counsel, the intended provisions of any applicable regulatory authority or court decision, then said term shall be governed by said regulatory provision or decision and the subject term of this Agreement shall be deemed automatically amended or deleted as the case pertains. Should such amendment or deletion materially affect the substance of this Agreement, then this Agreement shall be subject to immediate termination upon written notice to the other party.

**C.** The Associate understands that the eligibility requirements for the sales position designations of "Marketing Director", "Qualified Marketing Director", "Senior Marketing Director", "National Marketing Director", "Executive Marketing Director", "CEO", and otherwise, as well as the obligations that are imposed upon the Associate in such positions shall be as are published from time to time and that said requirements may be changed from time to time, by WMA and that such designations are within the sole discretion of WMA.

**D.** All notices or demands hereunder shall be sent either by certified mail, return receipt requested, postage and certified fees prepaid or by overnight courier service, addressed as follows: if to WMA, addressed to Administrator of Contracts, World Marketing Alliance, Inc., at its then principal home office address in Georgia; if to an officer, director or employee of WMA, then addressed to that person c/o World Marketing Alliance, Inc.; and if to the Associate, addressed to him/her at the address which appears on the first page of the WMA License Application Package. For purposes of this Agreement, the Associate shall maintain only one address at a time (the "Associate's Principal Address"), and shall immediately notify WMA of any change in the Associate's Principal Address.

**E.** The failure or delay by any party to insist upon strict performance of the terms and conditions of this Agreement shall not be deemed a waiver of any subsequent breach or default in the terms hereof. Any waiver must be in writing and signed by the party granting the waiver.

**F.** Titles and headings of sections and subsections of this Agreement are for convenience and are not intended to encompass all of the provisions therein or to interpret such provisions.

**G.** If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

**H.** The Associate may not assign any rights or delegate any duties under this Agreement except as expressly provided herein. WMA may, from time to time, desire to assign to its affiliates or others all or a part of its rights and obligations hereunder (a "future assignment"); and the Associate consents and agrees to any such future assignment and agrees that, after any such future assignment, WMA shall be released from all obligations and liabilities so assigned, so long as such obligations and liabilities are assumed by the assignee.

**I.** If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith.

**J.** This Agreement, including any Associate Agreement Rules constitutes the entire agreement and understanding between the parties hereto, unless another agreement is executed simultaneously with or subsequent to this Agreement by the parties which makes specific reference to this Agreement and expressly supplements or modifies this Agreement. No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding upon WMA unless in writing and signed by WMA.

**K.** Since the parties acknowledge that significant aspects of performance of this Agreement will occur in the State of Georgia, even though the business activities of the Associate may occur anywhere authorized, provisions of this Agreement (other than the provisions pertaining to the Covenants and Article II, Section N, as to which the parties do not specify an agreed upon choice of law) will be governed and construed under the laws of Georgia. If conflict or choice of law rules would choose a law of another jurisdiction, each party waives such rules and agrees (other than with respect to the Covenants and Article II, Section N) the substantive law of Georgia shall nonetheless govern. The parties agree that, without waiver of their rights and obligations under Section V., unless expressly provided to the contrary in this Agreement, the state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties and the Associate expressly submits to the jurisdiction and venue of the federal and state courts sitting in Gwinnett County, Georgia or Cobb County, Georgia with respect to any such litigation.

**L.** The Associate agrees that WMA shall have the right to run credit, employment and other financial and background investigations on the Associate at any time WMA deems useful, whether such investigation is conducted by WMA or by an outside service or third party. The Associate consents to such investigations and consents to the disclosure of any person or entity to WMA of any financial, background and employment information conducted by WMA or by an outside service or third party.

**M.** As a condition to becoming a member of "World Marketing Alliance", the Associate is not required to purchase any of the Products and Services and is not required to pay WMA or the Preferred Companies any consideration except for the administrative fee to process his/her application for membership. Further, the Associate is not required to enter into any contract with WMA or the Preferred Companies in order to purchase any Products and Services.

**N.** The Associate irrevocably c___nts to and forever authorizes the use by WMA or ___ ___ be authorized by WMA, its legal representatives or assigns, the absolute and unqualified right to use all photographs in which t___ Associate has appeared for WMA and reproductions thereof, in which the Associate has been included in whole or part, made through any media without inspection or approval of the finished product or use to which it may be applied, in any manner WMA may desire, factually or fictionally, including the right to make adaptations of said material of every and any kind and character. For such purpose WMA may adopt, arrange, change, dramatize, make musical versions of, interpolate in, transpose, add to, and subtract from such photographs and reproductions to such extent as WMA, in its sole discretion, may desire, and in any language; and, further to obtain copyright in all countries on such use by WMA, of such material in any form and upon any and all adaptations thereof to renew such copyrights. The Associate releases and discharges WMA, its assigns, agents, or licensees from any and all claims and demands that the Associate may have, which arise out of or in connection with the use of such photographs or reproductions, including but not limited to, any and all claims of libel, slander, and invasion of privacy. The Associate further releases WMA, its assigns, agents, or licensees from any liability of alterations, optical illusion or faulty mechanical reproduction. The Associate is over eighteen years of age and has read the above authorization and release prior to its execution.

The Associate hereby elects to be:  a Dedicated member _____  or a Non-Dedicated member _____
    (Choose one and initial)                  (please initial)                              (please initial)

ASSOCIATE:                                WORLD MARKETING ALLIANCE, INC.

COLIN  BUCKINGHAM
Print Name:

By _____
                                          S. HUBERT HUMPHREY, JR.

Signature:

Date:  8 / 13 / 99

# WORLD MARKETING ALLIANCE, INC.

## GLOSSARY AND EXPLANATION OF TERMS

The following sections ("Sections") define and explain additional terms which apply to and are part of the Associate's Associate Membership Agreement ("Agreement").

A. "Advance Commissions". Any monies that may be paid to Associate from any WMA Affiliate as an advance against Associate's commissions, or Associate's Override Compensation, either or both of which are yet to be earned, that may become due and payable by any WMA Affiliate.

B. "Associate Agreement Guidelines" and "Associate Agreement Rules". "Associate Agreement Guidelines" are those guidelines published in writing from time to time by WMA to WMA Associates containing sales position designations, performance standards, commission rates, and other matters affecting WMA Associates' compensation. "Associate Agreement Rules" are those rules published in writing from time to time by WMA to WMA Associates containing certain additional requirements imposed on WMA Associates as part of their contractual relationship with WMA. Associate Agreement Guidelines and Rules are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Associate Agreement Guidelines and Rules are not governed by the notice requirements of this Agreement, provided, however, that any changes set forth therein shall be effective as of the date of general publication.

C. "Corporate People". Any and all of the officers, directors and employees of WMA or any WMA Affiliate, whether present or past and whether in their individual or their corporate capacities.

D. "Covenants". Those covenants set forth below in this Section D.

1. Valuable Assets of WMA. The Associate understands and acknowledges that WMA has developed, through the expenditure of considerable sums of monies, and owns, the following valuable, special and unique assets: i) a competent network of contractually affiliated sales associates/representatives, which representatives are located throughout United States, but are and have been organized and trained, with the result that WMA is a highly effective marketing organization; ii) a lasting and sophisticated relationship with the Preferred Companies; and iii) the Customers particularly insofar as WMA receives its primary compensation from sales of Products and Services to such Customers. The Associate understands and acknowledges that the commissions the Associate earns from the sale of Products and Services constitute, in part, compensation for producing the property rights of WMA in its network of contractually affiliated sales associates/representatives and in the Products and Services sold by the Associate or his/her Downline Associates and for the Associate's agreement herein not to violate or interfere with such property rights and not to breach the covenants set forth below.

2. Customer Non-Replacement. The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly, individually or in concert with another, induce or attempt to induce any Customer to terminate, reduce coverage under or replace any of the Products and Services which have been sold by the Associate or his/her Downline Associates. In this Section D., the term "Customer" shall be limited during the two (2) year period after the Termination of this Agreement to those Customers i) to whom the Associate or his/her Downline Associates sold Products and Services; and ii) who reside, at the time of the inducement or attempted inducement, in the geographical area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding Termination of this Agreement. The Associate understands and acknowledges that this Section D(2) is not a non-solicitation covenant, it is a non-replacement covenant. For purposes of this Agreement the Associate's office shall mean that office or offices from which the Associate, during the eighteen (18) month period preceding Termination of the Agreement, conducted his/her business operations as an Associate of WMA. The Associate agrees and acknowledges that a breach of the Associate's promise in this Section D(2) would constitute wrongful interference with contractual rights of WMA

3. Associate Non-Recruitment. The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly: i) induce or attempt to induce any person who is contractually affiliated with WMA as an associate or in other capacity, or any member of WMA's administrative staff, to terminate their relationship with WMA; or ii) hire, induce or attempt to hire or induce any such persons to sell or solicit products and services which are competitive with the Products and Services for any person or entity other than WMA. The Associate's covenants in the preceding sentence are limited and only apply with respect to any person that resided in or engaged in business activities in the geographic area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. The Associate acknowledges that any violation of this Section D(3) by the Associate with respect to any member of WMA's network of contractually affiliated sales associates/representatives constitutes wrongful interference with WMA's contractual relationship with such persons and with WMA's and the Preferred Companies' administrative staffs.

4. Non-Disclosure Covenant. The Associate will not use, disseminate or reveal, other than on behalf of WMA as authorized by WMA or the Preferred Companies, while this Agreement is in force, or within two (2) years after Termination of this Agreement, any confidential information or trade secrets of WMA or of the Preferred Companies, which the Associate has or hereafter receives, including any Customer or list of WMA Associates, whether obtained from WMA or any other person, or compiled by or on behalf of the Associate; provided, however, that confidential information does not include information which becomes generally available to the public other than as a result of disclosure by the Associate or any member of WMA's network of contractually affiliated sales associates. The Associate agrees that immediately upon the Termination of this Agreement he/she will return all documents, files and lists containing any confidential information or trade secrets to WMA and the same shall not be copied or duplicated. For purposes of this Agreement the term "confidential information" means any and all confidential and proprietary data and information created by or belonging to WMA which has value to and are not generally known by the competitors or potential competitors of WMA now or hereafter acquired or disclosed to the Associate.

5. Non-Solicitation. The Associate shall not, at any time during the term of this Agreement, directly or indirectly, individually or in concert with another, solicit or attempt to solicit, induce or attempt to induce any member of WMA's network of contractually affiliated sales associates/representatives to purchase any products and services other than the Products and Services

6. Covenants of Other Associates and Harm to WMA. The Associate acknowledges that all members of WMA's network of contractually affiliated sales associates/representatives have executed agreements with WMA containing covenants identical or similar to the Covenants and that any act by the Associate to induce or attempt to induce any member to breach any portion of his/her agreement with WMA would constitute wrongful interference with the contractual rights of WMA, such as the

7. **Equitable Relief.** The Associate acknowledges and agrees that, in the event that ...he were to violate or threaten to violate any of the Covenants, WMA's recovery of damages would be inadequate to protect WMA. Accordingly, the Associate agrees that, in the event of a violation, actual or threatened, of any such Covenants, WMA shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary. The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons, the property rights of WMA which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected.

8. **Reasonableness and Severability.** The Associate acknowledges that the Covenants do not restrict the geographic areas in which the Associate may have Downline Associates and in which the Associate or such Downline Associates may solicit for the sale of Products and Services and that members of WMA's network of contractually affiliated sales associates/representatives frequently share offices with and have access to Customer information of other members, whether or not in the Associate's hierarchy. Accordingly, the Associate acknowledges and agrees that the Covenants would be reasonable even with a much broader geographical limitation. The Associate understands that these Covenants constitute consideration for all post-termination accrual or payment of any commissions, including Override Compensation. The Associate agrees that the Covenants are reasonable as to the Associate and necessary to protect the interest of WMA and that WMA would not associate with the Associate unless he/she entered into these Covenants. The Covenants and the acknowledgments and agreements contained in this Section D are severable and separate, and should a court determine any covenant or portion thereof to be unenforceable, it shall not affect the validity of any other paragraph of this Agreement or portion thereof. The Covenants and the acknowledgments and agreements in this Section D shall be construed as independent of any other provision in this Agreement, except (notwithstanding Article IX(G)) accrual and payment of commissions and Override Compensation. The existence of any other claim or cause of action of the Associate, whether predicated on this Agreement or otherwise, shall not constitute a defense to these Covenants or the acknowledgments.

9. **Collateral Consequences.** In addition to the rights WMA has to enforce the Covenants, the Associate agrees and understands that in the event of any breach by him/her of any of the Covenants or the provisions of this Section D, whether during the term of or after the Termination of this Agreement, no further commissions shall accrue or be payable to Associate by WMA or any WMA Affiliate, or shall be accrued or paid to reduce any Debit Balance, and any Debit Balance shall thereafter be immediately due and payable by the Associate. Compliance with each of the Covenants is an express condition for the accrual, earning or payment of any commissions and Override Compensation by WMA or any WMA Affiliate and the parties do not intend for any payment provisions under this Agreement to be enforceable by the Associate independent of his/her observance of these Covenants.

E. **"Customers".** Any person, or entity, from whom Associate, or any of Associate's Downline Associates, solicits or attempts to solicit applications for new applications for Products and Services.

F. **"Debit Balance".** The balance remaining from time to time after subtracting the commissions and earned commissions actually earned but unpaid, which are due and payable by WMA or a WMA Affiliate to Associate, from any money and value owed (regardless of whether it is then due or not) by Associate to WMA or to any WMA Affiliate, including but not limited to expenses license fees, commissions, and expenses that Associate is required to refund to WMA or a WMA Affiliate because of customer or customer cancellations, rights of withdrawal, non-renewals, terminations, lapses or otherwise. Advance Commissions, Debit Balances of Associate's Downline Associate(s), expenses and fees incurred by WMA or any WMA Affiliate in attempting to resolve prospective downline Associates of Associate, WMA or any WMA Affiliate claims for indemnification against Associate and other claims by WMA or any WMA Affiliate against Associate, and any and all money and value which may be paid, advanced or credited by or on behalf of WMA or any WMA Affiliate, to, or for the benefit of, Associate.

G. **"Divestiture".** Notwithstanding anything in this Agreement to the contrary, after termination of this Agreement for any reason Associate's violation or failure to comply with any promise, obligation, covenant, warranty or representation contained in this Agreement or in any Associate Agreement Guideline or Rule that survives the termination of this Agreement, which violation or failure results in the automatic forfeiture by Associate of Associate's right to receive commissions.

H. **"Downline Associate".** Any Associate of WMA or of any WMA Affiliate upon whose sales flow or revenue production Associate is entitled to earn Override Compensation.

I. **"Good Faith Arbitration".** The procedures set forth in this Section I to resolve all Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further.

1. **General.** All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules, except that, in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, Associate, agent, registered representative, attorney or other representative of any insurance company, insurance broker or insurance agency, securities broker, securities dealer or mortgage company, investment advisor, or of any affiliate of any of them; ii) the Parties may be entitled to such discovery and protective orders as provided herein; iii) the locale where the arbitration shall be held is the principal head office of WMA in Atlanta, Georgia or, if that location is not convenient for all Parties, they shall try to devise a way so that it is convenient, or if that location cannot be made convenient, at such other place as the Parties may agree, or, if they cannot agree, then as may be set by the Rules, as the case may be; iv) a transcript shall be made on the proceeding; and v) the arbitrator(s) award shall state their findings of fact and conclusions of law.

2. **Judicial Review of Award.** The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

3. **Discovery; Protective Order.** Discovery (in the form of production of documents and depositions) of evidence pertinent and material to the Grievance, may be ordered by the arbitrator(s). The discovery shall be on such terms and at such times and locations as ordered by the arbitrator(s) and their orders may be enforced by courts of competent jurisdiction. In connection with

all discovery and hearings regarding Good Faith Arbitration as the arbitrator(s) shall find proper under the circumstan and the protective orders may be enforced by c s of competent jurisdiction.

4. **Waiver of Litigation**. The Parties acknowledge and agree that, except as specifically provided to the contrary in this Agreement, this Section I is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. It is the intent of the Parties that, except as specifically provided to the contrary in this Agreement, to the fullest extent allowed by law all Grievances, including any claim or defense (whether created or governed by federal, state or local law, rule or regulation) shall be resolved in an arbitral rather than a judicial forum. It is understood by the Parties that it is to their mutual benefit to submit Grievances that they are unable to resolve themselves for resolution by a neutral referee in an arbitral rather than a judicial forum. Those Parties recognize that by choosing Good Faith Arbitration as the mechanism for resolving Grievances, each Party expects to ensure a more expeditious and economical resolution of their Grievances than is available in most cases in a judicial forum. Accordingly, except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

5. **No Condition Precedent to Action and Power of Arbitrators** Anything herein or elsewhere contained to the contrary notwithstanding, WMA shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

6. **Extraordinary Relief** The Parties agree that WMA has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief", under Article VI of this Agreement without complying with Article V of the Agreement or this Section I. Without limitation, the Parties agree that the requirements for Good Faith Arbitration under Article V of the Agreement or this Section do not preclude WMA from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Article VI of the Agreement. Neither Article V of the Agreement or this Section I shall be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

7. **Statute of Limitations**. Unless otherwise tolled or satisfied with respect to Good Faith Arbitration, a demand for arbitration must be filed under the Rules within the time prescribed by the applicable statutes of limitations.

8. **Beneficiaries**. The Associate and WMA intend and agree that all of the Corporate People shall be Beneficiaries of all of the provisions of this Section I and that as Beneficiaries and as Parties, they, or any of them shall have the right to enforce all provisions of this Section I to the same extent as WMA and the Associate.

J. **"Grievance"** Any controversy, claim or dispute arising out of or relating to this Agreement, between the Associate, on the one part, and WMA and/or any of the Corporate People, or any of them, on the other part.

K. **"Indemnified Loss"** Any and all liability, claims, demands, proceedings, obligations, assessments, loss, cost, damage and expense, of any nature whatsoever, contingent or otherwise (including, without limitation, any and all judgments, decrees, equitable relief, extraordinary relief, settlements, awards, attorney's fees, court costs, punitive damage and arbitration costs including arbitrators' fees).

L. **"Indemnified Party"** WMA and the Corporate People

M. **"Products and Services"** Those products and services selected, approved and designated from time to time by WMA for which Associate may solicit applications

N. **"Override Compensation"** Those commissions that are earned by an Associate from sales of Products and Services made by other WMA Associates and those commissions that are earned by an Associate from sales of products and services made by sales representatives or contractors of any WMA Affiliate, in accordance with commission schedules, rules and regulations issued by WMA or any WMA Affiliate from time to time. Override Compensation is earned only by the faithful performance of Associate's obligations under this Agreement, including, but not limited to, those obligations relating to Associate's Downline Associates.

O. **"Preferred Companies"**. Those companies with whom WMA has established a contractual relationship authorizing Associates of WMA to solicit sales of Products and Services for such companies; and those companies with whom any WMA Affiliate has established a contractual relationship authorizing sales representatives or contractors of any WMA Affiliate to solicit sales of products and services for such companies

P. **"Prohibited Actions"**. Associate is prohibited from, and agrees that Associate shall not. i) collect from Customers, in payment of the purchase of Products and Services, cash, or checks made payable other than to the appropriate Preferred Company, custodian bank or transfer agent relating to such purchases, all as designated by WMA; ii) offer to sell any products and services unless such are Products and Services, except as otherwise expressly set forth in this Agreement; iii) offer or sell any Products and Services unless there exists at the time of such offer or sale an effective agreement between WMA and the Preferred Company, if any, making available such services; iv) make, alter or discharge on behalf of WMA any contract or investment, or waive any provision other than in strict compliance with the terms and conditions of all applicable laws and in accordance with this Agreement and the procedures, manuals, guidelines, rules and regulations with this Agreement and of WMA; or v) make any misrepresentation, or improperly induce a Customer to purchase Products and Services.

Q. **"Roll Up"**. The transfer, with recourse, of the Debit Balance of a downline Associate to that downline Associate's first above Upline Associate. The term Roll Up includes the transfer, with recourse, from a Downline Associate to Associate, and also from Associate to the first above Upline Associate. All Roll Ups are with full recourse and the Associate (including the Associate from whom the Debit Balance is Rolled Up) shall remain liable for the Debit Balance, and all interest and liability in connection therewith, to both WMA or any WMA Affiliate and to all upline Associates (including Upline Associates) who suffer the Roll Up. In the event that any portion of a Downline Associate's Debit Balance is Rolled-Up to the Associate in accordance with the terms of Associate's Associate Membership Agreement, including the Associate Agreement Guidelines or Rules, or Associate's agreements with WMA Affiliates, and WMA or any WMA Affiliate directly or indirectly collects said Debit Balance from the Associate, then WMA or any WMA Affiliate may authorize in writing the Associate to collect the Debit Balance from the Downline Associate. If said Downline Associate repays his/her Debit Balance to WMA or a WMA Affiliate, then the Associate will be credited for the amount repaid; if the Associate collects any portion of the Debit Balance from the Downline Associate, such portion must be remitted to WMA or a WMA Affiliate by the Associate and the Associate will be credited the amount remitted. If such Rolled Up Debit Balance is not

Associate Membership Agreement-Glossary and Exhibits

Associate who shall become liable therefore to WMA or the WMA Affiliate, as the case may be. Balance is Rolled-Up to an Upline Associate and WMA or a WMA Affiliate collects said Debit Balance from the Upline Associate, then such Upline Associate shall ~~possess~~ all the legal rights and remedies WMA or the WMA Affiliate would have to require the Associate to repay his/her Debit Balance. Anything herein contained to the contrary notwithstanding, in any case where Associate or an Upline Associate suffers a Roll Up, the liability for payment of that Roll Up by Associate or Upline Associate shall be limited to deduction by WMA or a WMA Affiliate from amounts owed by WMA or a WMA Affiliate to Associate and Upline Associate, and to the Downline Associates who caused the Roll Up.

R. "Rules". Where required to be applied, the Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance.

S. "Termination". The occurrence of any of the following: i) the automatic termination, without notice, upon the death of Associate, or the revocation, termination or non-renewal of any of the Associate's licenses and registrations with any regulatory agencies, ii) the termination by Associate at any time, without any reason or any cause, effective upon the delivery of written notice to WMA, or iii) the termination by WMA at any time for "cause", effective upon the delivery of written notice to Associate. For purposes of this Agreement, Associate agrees and acknowledges that any of the following will be "cause" for termination of this Agreement by WMA: Associate's violation of any federal or state law or regulation; Associate becomes subject to sanctions or censure by any state or federal regulatory agency or body; Associate becomes temporarily or permanently enjoined from acting as a sales associate of WMA or conducting his/her business or performing any of his or her duties under this Agreement or from acting in any of the various capacities relating to the insurance or financial services business; Associate is censured, suspended or disciplined in respect to the violation of any law, rule, or regulation regarding the purchase or sale of any products and services, including the Products and Services; misappropriation or commingling of premiums or payments for any Products and Services; engaging in a fraudulent act or misrepresenting characteristics or benefits of the Products and Services; any interference with the collection of renewal premiums; Associate violates any law or regulation that governs the conduct of any part of Associate's business; Associate is indicted or subject to trial for any crime involving moral turpitude; Associate breaches any provision of, or fails to perform or observe any obligation under, this Agreement or any other agreement that the Associate may have, now or hereafter, as a member of "World Marketing Alliance"; Associate fails to timely discharge any monetary obligations to WMA or any WMA Affiliate; Associate engages in any activity which, in the sole opinion of WMA, may adversely affect the good name and reputation of WMA; any act or condition of Associate that, in the sole opinion of WMA, may cause professional, business, or financial instability of Associate. Associate's failure to comply with the procedures, manuals, rules, and regulations promulgated from time to time by WMA, including the Associate Agreement Rules and the WMA Manual; Associate's admitting in writing Associate's inability to pay debts as they become due, executing an assignment or similar document for the benefit of Associate's creditors, or the appointment of a receiver or trustee or similar officer regarding Associate's property; any false or incorrect statements made by Associate in any application to a regulatory authority; termination for any reason of any agreement between Associate and any WMA Affiliate or Preferred Company, or the failure of Associate to comply with WMA's annual compliance review and review procedure. At WMA's discretion, instead of immediately terminating this Agreement, WMA may impose suspension of Associate's benefits and rights and privileges, including suspension of rights to solicit for Products and Services and suspension and loss of commissions, and may impose other disciplinary action, without liability to Associate for loss or otherwise. Suspension or disciplinary action shall not in any way preclude or diminish WMA's rights to terminate this Agreement at any time. In the event of termination of this Agreement by either party, WMA shall be entitled to notify the Preferred Companies to terminate the Associate's contract(s) if any, with the Preferred Companies, and Associate acknowledges and agrees that neither WMA nor the Preferred Companies shall have any liability for any loss, damage or otherwise resulting from such termination by the Preferred Companies or notice from WMA.

T. "Upline Associate". Any Associate of WMA or any WMA Affiliate entitled to earn Override Compensation upon the sales activities of Associate.

U. "Vested". The right of Associate to receive commissions and Override Compensation after Termination of this Agreement, unless and until Divestiture occurs. If Associate becomes vested, then, in the event that this Agreement terminates due to Associate's death, WMA shall pay the commissions and Override Compensation to Associate's estate or, if specifically designated in writing by Associate, to Associate's surviving spouse.

V. "WMA Manual". WMA's field manual as in effect from time to time. The WMA Manual will be amended from time to time and WMA will provide Associate with such amendments.

W. "WMA Affiliate". Any legal entity which is under common control with WMA. Common control for this purpose shall mean ultimate stock ownership of 20% or more by the same person(s).

# WORLD MARKETING ALLIANCE, INC.
## Associate Membership Agreement

**THIS AGREEMENT** is made by and between **WORLD MARKETING ALLIANCE, INC.** (hereinafter referred to as "WMA"), and the undersigned individual (hereinafter referred to as the "Associate").

**WHEREAS, the** Associate desires to become a member of WMA's sales force (hereinafter referred to as "World Marketing Alliance" and further defined herein) which will be composed of a group of independent contractors ("members") who enter into agreements with WMA pursuant to which they become authorized to engage in the business of selling insurance and other financial service Products and Services offered by WMA; and

**WHEREAS,** WMA has established a contractual relationship with one or more companies (collectively, the "Preferred Companies", or individually, a "Preferred Company") authorizing WMA or the members of "World Marketing Alliance" to market and sell various Products and Services and to recommend and designate members of "World Marketing Alliance" for appointment with the Preferred Companies as independent sales representatives with respect to such various Products and Services; and

**WHEREAS,** WMA is continually recruiting new members to "World Marketing Alliance" and desires to have the Associate become a member of "World Marketing Alliance" by entering into a written agreement with the Associate which establishes and defines the terms and conditions of the Associate's membership in "World Marketing Alliance";

**NOW, THEREFORE,** in consideration of the premises, the mutual promises and covenants in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, and intending to be legally bound hereby, WMA, and the Associate agree as follows:

## I. Membership in "World Marketing Alliance"

**A.** The Associate hereby agrees to become a member of "World Marketing Alliance" and to abide by the terms and conditions of membership as hereinafter set forth in this Agreement.

**B.** There are two (2) types of members in "World Marketing Alliance": Dedicated and Non-Dedicated. Dedicated members are those persons who have made a decision to market for sale only those Products and Services marketed by WMA. Non-Dedicated members are those persons who have made a decision to market the Products and Services and other products and services not marketed by WMA. Although the membership terms of Dedicated and Non-Dedicated members will be identical in some respects, Dedicated members will be accorded certain benefits not available to Non-Dedicated members. Such benefits are described in Associate Agreement Rules and Guidelines as published from time to time by WMA

The Associate hereby elects to be a Dedicated member or a Non-Dedicated member as indicated on the signature page of this Agreement.

## II. Associate's Duties As A Member

**A.** As a member of "World Marketing Alliance" the Associate promises that he/she will do the following:

1. Use his/her best efforts to sell and promote the sale of the Products and Services;
2. If a Dedicated member, not be involved or associated in any manner with any hierarchial sales organization of any kind in which commissions are paid based on multi-generational levels;
3. If a Dedicated member, not market or sell any products or services other than the Products and Services;
4. If a Non-Dedicated member, Associate agrees to disclose and notify WMA in writing as to the general nature of Associate's involvement and/or affiliation with any other business or company.
5. Not market or sell any products or services to any member or prospective member of "World Marketing Alliance";
6. Preserve the good name and reputation of "World Marketing Alliance" and WMA and not do anything that will damage the name and reputation of "World Marketing Alliance" or WMA;
7. Comply with all rules and guidelines set forth in the Associate Agreement Rules and Guidelines and the WMA Manual, either now existing or as issued from time to time by WMA.
8. Comply with all of the terms and conditions of any contract(s) into which Associate enters with WMA, the Preferred Companies, or any companies with which WMA is or may hereafter become affiliated, directly, indirectly, through common ownership, by contractual agreement, or otherwise ("WMA Affiliated Companies"). For purposes of this Agreement, any reference hereinafter made to WMA shall be deemed to constitute a reference to all of the WMA Affiliated Companies.
9. Participate in the training that will be provided to "World Marketing Alliance";
10. Refrain from selling or soliciting for sale any Products and Services that require licensing or registration of a Preferred Company until the Associate receives written notice from WMA or the Preferred Company that the Associate has been approved to market such Products and Services; and
11. Execute such further agreements and obtain such licenses that WMA determines to be required for the Associate to be lawfully authorized to sell any of the Products and Services.
12. Diligently fulfill supervisory responsibilities with respect to Downline Associates.

**B.** The Associate understands and acknowledges that WMA is in the business of building "World Marketing Alliance" to provide Products and Services to the consuming public and "World Marketing Alliance" is a valuable asset of WMA. The Associate acknowledges that WMA owns all rights in and to the following: (i) "World Marketing Alliance", which, for purposes of this Section II.B., includes all persons in force as independent contractor agreements with WMA and all agreements, (ii) the identities of and all lists of the members comprising "World Marketing Alliance"; and

(iii) the identities of and all lists of the customers produced by "World Marketing Alliance" ("Customers") (even though Associate recruited any of the members or produced any of the Customers) which constitute property of WMA. Associate agrees that Associate shall have no proprietary interest in, or ownership of Customers, other Associates of WMA including online Associates, or Products and Services. WMA shall have exclusive proprietary interest in, or ownership, of all Customers, and contractual relationship with other Associates and the Preferred Companies.

**C.** As a member of "World Marketing Alliance", the Associate is not an employee of WMA or "World Marketing Alliance". Instead, the Associate's relationship with WMA is that of an independent contractor. Nothing in this Agreement shall be construed to constitute the Associate as a partner, employee or agent of WMA, nor shall WMA, the Preferred Companies or the Associate have any authority, except as expressly provided herein, to bind the other, it being the intention that each shall remain an independent contractor responsible for his/her own actions. Subject to all applicable local, state and federal laws and regulations, this Agreement, Associate Agreement Guidelines and Rules, the WMA Manual, and any contract(s) between the Associate and the Preferred Companies, the Associate shall conduct and control his/her business activities, work hours, selection of customers, office location and sales methods. Even though a state license or form may designate the Associate as an "employee" of WMA or the Preferred Companies, such designation will not change the fact that by definition and by practice the Associate is an independent contractor. As an independent contractor, the Associate shall be responsible for paying any and all federal, state, city or other taxes that may become payable with respect to any compensation the Associate may receive under the terms of this Agreement.

**D.** Associate shall promptly pay all expenses relating to the performance of Associate's duties under this Agreement, including but not limited to indebtedness to WMA and premium costs of errors and omissions insurance required by WMA. Associate shall be solely responsible for all his/her expenses, including but not limited to travel, entertainment, office, signs, telephone, education, dues, subscriptions, licenses, etc., and shall receive no remuneration or reimbursement of any nature whatsoever other than the commissions referred to herein. Company shall not provide any facilities, furniture or equipment to Associate. Associate shall provide his/her own office, telephone, supplies, transportation, and all other facilities which Associate may deem necessary.

**E.** Associate shall supervise the WMA-related activities of Associate's Downline Associates and use Associate's best efforts and continuing diligence in directing Associate's Downline Associates to comply with their respective associate membership agreements with WMA and in training and providing assistance to Associate's Downline Associates, all in accordance with WMA policies and procedures, including those contained in the Associate Agreement Rules and Guidelines. Associate's fulfillment of such supervisory and training responsibilities is an essential requirement of Associate's compliance with this Agreement.

**F.** Associate shall, as required to sell Products and Services, be duly licensed in each jurisdiction in which and from which Associate solicits, offers obtains applications and orders for purchase of Products and Services and in each jurisdiction, where required by law, in which and from which Associate receives Override Compensation. Associate will bear the cost of all initial and renewal fees for licensing and registration. Associate will make payment instructed by WMA.

**G.** Associate shall maintain accurate and current records of all transactions entered into pursuant to this Agreement. Such books and records shall conform to the requirements of federal and state laws, the rules and regulations of appropriate regulatory agencies and the policies and procedures of WMA and of Associate's branch office to which Associate reports. Associate shall maintain an accurate and current file of all commission statements and old records and correspondence received from WMA and notify WMA in writing within thirty (30) days after receipt thereof if such statements, records and correspondence, or any of them, is inconsistent with Associate's records or, in the opinion of Associate, not accurate. As to any statements, records, correspondence furnished by or on behalf of WMA to Associate, if Associate does not furnish WMA with written objections or corrections within thirty (30) days of mailing by WMA, then Associate shall be deemed to have approved such statements, records and correspondence as to any matter not objected to or corrected, and to have released WMA from liability and responsibility for all matter contained therein.

**H.** Associate shall not use sales material of any kind which has not been approved in writing by WMA for such use, including but not limited to any type of form letter or correspondence. Without the prior written approval of WMA, Associate shall not use any form of media, including but not limited to radio, newspaper, television, letters, business cards, letterhead, or photocopies, to promote sales. The Associate promises not to use the name "World Marketing Alliance" in conjunction with any notation indicative of a business organization, such as "Corporation", "& Company", "Ltd.", "Inc.", or "Associates", unless the Associate is specifically granted written permission from WMA to do so. The Associate may not appropriate the name "WMA" or "World Marketing Alliance" for use in any corporate name, joint venture or partnership.

**I.** All activities conducted by Associate under this Agreement shall be conducted in accordance with all applicable laws. Associate also has the duty to faithfully abide by the rules and regulations set forth in the Associate Agreement Rules and Guidelines that may be issued from time to time, the WMA Manual, as amended from time to time, and all bulletins or memoranda issued by the Preferred Companies. Associate shall immediately advise WMA of any action or fact whatsoever which comes to Associate's knowledge which may possibly constitute a violation of any applicable laws or regulations with respect to WMA, Associate or any party who is, has been, or may be doing business with WMA. The Associate's failure to comply with, or failure to cause his/her Downline Associates to comply with, any Associate Agreement Rule constitutes a material breach of this Agreement.

**J.** WMA has contracted with one or more insurance companies to provide WMA and its independent contractors with group plans for errors, omissions and fidelity insurance coverage. Associate is required to participate in these group plans and monthly insurance premiums will be deducted by WMA from commissions due to Associate. If Associate's commissions are insufficient to cover the monthly insurance premiums, then WMA shall have the right to direct any WMA Affiliate to offset such deficit against any earned commissions due to Associate, or, at the option of WMA, Associate may be billed for the total amount of accrued insurance premiums and such amount will be paid in full by Associate within 15 days of the billing date, otherwise this Agreement will be terminated. WMA specifically reserves the right to modify insurance premiums charged without prior notice.

**K.** Associate shall not take, undertake or engage, directly or indirectly, in any Prohibited Actions.

**L.** Associate acknowledges and agrees that all supplies, including but not limited to prospectuses, memoranda, visual aids, specimen plan forms, manuals, statistical and sales training and/or recruitment materials, vendor materials and brochures, furnished by WMA to Associate are and shall be property of WMA and shall be returned promptly to WMA upon demand.

ASSOCIATE MEMBERSHIP AGREEMENT

DATE: 5

**M.** Associate shall comply with the terms, conditions and restrictions on use contained in any and all license or other contractual agreements between third party owners of any computer software and WMA or any WMA Affiliate, pursuant to which WMA or a WMA Affiliate has obtained the right to use such computer software. Associate further agrees to comply with the terms of any license or other contractual agreement into which Associate is required to enter with any third party computer software owner.

**N.** Associate shall not violate the Covenants.

## III.  Associate's Compensation

**A.**  The Associate acknowledges and understands that the Associate earns income only from the sale of the Products and Services and no income is earned by or paid to Associate for recruiting. The Associate's sole compensation under and during the term of this Agreement shall be commissions paid to, or caused to be paid by, WMA pursuant to this Agreement and paid in the manner provided in, and subject to the terms and conditions contained in, these Associate Agreement Guidelines and commission schedules which are published by WMA from time to time. The Preferred Companies are generally not obligated to pay the Associate any money. There is no guarantee that the Associate will be financially rewarded solely by virtue of becoming a member of "World Marketing Alliance."

**B.**  WMA will publish Associate Agreement Guidelines and commission schedules from time to time which relate to sales position designations, performance standards, commission rates of WMA or the Preferred Companies and other matters affecting the terms of the members' compensation. WMA may, from time to time, in the exercise of its sole discretion, and without notice, increase or decrease the rates and amounts of commissions or the sales position of Associate; provided, however, that may such changes may be prospective only, but may affect any new business and any commissions earned thereafter on existing business.

**C.**  Associate acknowledges and agrees that Associate's commissions are a share of WMA's commissions and Associate's commissions are earned by, and shall be payable to, Associate only after all of the following have occurred:  i) the order or application for Products and Services submitted by Associate is accepted and approved by WMA or a Preferred Company at its principal office; ii) by an approved WMA designee;  ii) actual payment for the same has been made by and received from the Customer; and iii) WMA has actually received payment from a Preferred Company, if applicable, of WMA's commission (subject to WMA's refund rights set forth in Section III.G. of this Agreement).

**D.**  Any money and value owed by Associate to WMA, any Debit Balance, and any money and value which has been advanced or credited by or on behalf of WMA or a WMA Affiliate to, or for the benefit of, Associate, represents a loan and may be offset and deducted by WMA from any commission or other money or value then or thereafter owed by WMA to Associate. WMA is hereby authorized by Associate to deduct from commissions due the amount of any commissions paid to Associate in connection with any payment or amount that WMA refunds to Associate's Customer.

**E.**  All Debit Balances shall be repaid immediately by Associate upon notice thereof to Associate by WMA or a WMA Affiliate. Any Debit Balance not paid within thirty (30) days from the effective date of such notice shall bear interest from the end of such thirty (30) days at a rate equal to the maximum legal rate of interest provided by applicable law. From time to time in its sole discretion, WMA or a WMA Affiliate may cause a reduction in all or a portion of the Associate's Debit Balance in any of the following ways:  i) by applying any commissions or other forms of compensation payable to the Associate by WMA or a WMA Affiliate to reduce the Associate's Debit Balance; or ii) by exercising any other legal rights and remedies available to WMA or a WMA Affiliate, including any rights or remedies that are included in Associate Agreement Guidelines and Rules. The Associate is also obligated to repay WMA or WMA Affiliates for the Debit Balances of any of Associate's Downline Associates. If a Downline Associate does not pay his Debit Balance either after ninety (90) days from the effective date of notice by WMA or a WMA Affiliate to Downline Associate, or immediately upon termination of that Downline Associate's Associate Membership Agreement with WMA or other contractual agreement with a WMA Affiliate, then that Downline Associate's Debit Balance, and the interest and other liabilities in connection therewith, shall Roll Up to Associate and become in all respects part of Associate's Debit Balance for which Associate and such Downline Associate shall be jointly and severally liable for payment to WMA or a WMA Affiliate.

**F.**  Except as otherwise provided in this Agreement, and subject to the terms of this Section III.F., if and when Associate qualifies for and attains certain sales position designations established by WMA from time to time pursuant to Associate Agreement Guidelines, Associate shall become Vested and entitled to receive commissions upon the Termination of this Agreement for any reason, unless and until Divestiture occurs. However, Associate acknowledges and agrees that since Associate's commissions are a share of WMA's commissions, Associate shall, upon becoming Vested, be vested in commissions only to the extent that WMA actually receives commissions with respect to the applicable Customers from the Preferred Companies. In the event that Associate, at the time of Termination of this Agreement, has not qualified and attained the sales position designation(s) established by WMA as a condition to becoming Vested, Associate shall have no right to commissions or any compensation of any kind.

**G.**  In the exercise of its sole discretion, WMA reserves the right to, and may, refund to any Customer all or any part of payments made by Customer, and Associate agrees to promptly reimburse WMA for its expenses in connection therewith. Associate further agrees to promptly repay WMA all commissions by Associate with respect to any refunds to Customers, and WMA is hereby authorized to deduct from any other commissions due or that may become due to Associate hereunder, the amount due WMA for any such expenses or commissions to be repaid by Associate.

**H.**  Except as set forth above in Sections III.A. and III.F., Associate shall receive no other compensation of any kind whatsoever under this Agreement. Associate will not receive any fringe benefits under this Agreement whatsoever, including but not limited to insurance benefits, disability income, paid vacation, expense reimbursement or retirement benefits unless otherwise specifically provided for in this Agreement.

## IV.  Term and Termination

**A.**  This Agreement shall continue in effect until Termination.

**B.**  Upon the Termination of this Agreement, all commissions due to Associate prior to the effective date of Termination of this Agreement shall be paid by WMA to Associate within a reasonable period of time. Except for commissions which Associate may become entitled to receive if Associate becomes Vested in accordance with Section III.F. of this Agreement, no further compensation, other than the commissions earned as of the effective date of

Associate's Termination, shall be payable to Associate under this Agreement after Termination. However, WMA or any WMA Affiliate shall have the right to offset against any commissions, any Debit Balance, indebtedness owed by Associate to WMA or to any WMA Affiliate, or any charges made by WMA or a WMA Affiliate to Associate occasioned by improper activity, etc. Upon Termination of this Agreement, any Debit Balances then or thereafter outstanding, and any Debit Balances that may thereafter exist, shall without notice immediately become due and payable and shall bear interest at the highest rate permitted under applicable law until paid. Associate shall promptly surrender to WMA all books and records relating to WMA including but not limited to all applications and payments which Associate may have in his/her possession or under his/her control at the time of Termination.

## V.  Arbitration of Grievances

The Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved exclusively by Good Faith Arbitration. For purpose of this Article V, the terms "Party" and "Parties" include WMA, the Associate and the Corporate People.

## VI.  Extraordinary Relief

The Associate acknowledges that WMA would suffer extremely costly and irreparable harm, loss and damage if any of the provisions of this Agreement are violated by the Associate. The Associate agrees that WMA shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by the Associate of this Agreement and that WMA may seek Extraordinary Relief in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration, and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

## VII.  Associate's Promise to Indemnify and Assign

**A.** The Associate agrees to indemnify and hold harmless, from and against any and all Indemnified Losses which are incurred, sustained, suffered, or assessed against the Indemnified Party, or all or any combination thereof, because of, arising out of or as a result of any acts or omissions, including but not limited to a breach of Section II.N. or any breach of Associate's contract(s) with Preferred Companies, by the Associate and also any of Associate's Downline Associates. The Indemnified Party shall be entitled to use counsel of its own choosing, shall be entitled to determine the validity of the Indemnified Loss and shall not be required to notify the Associate of the existence or progress of any claims or Indemnified Loss as a condition precedent to requiring payment by the Associate to the Indemnified Party for an Indemnified Loss.

**B.** To secure the Associate's promise of indemnification and the Associate's obligation to repay his/her Debit Balance or his/her Downline Members' Debit Balances, the Associate hereby assigns to WMA, and grants, and agrees to, from time to time, execute any additional instruments or documents necessary to perfect, a continuing security interest to WMA in, all commissions (or advances thereon) otherwise payable to the Associate by WMA, to the extent necessary to satisfy WMA for any such Indemnified Loss or any such Debit Balance obligations. This assignment is given to WMA to secure the Associate's obligations as set forth above and elsewhere in this Agreement. WMA has the right to withhold commissions in connection with this indemnity.

## VIII.  Representations and Warranties

**A.** The Associate expressly represents and warrants that the Associate has the authority to enter into this Agreement and that the Associate is not and will not, by virtue of entering into this Agreement and consummating the transactions contemplated hereby, or otherwise, be in breach of, violate, or interfere with, any other contract, agreement, or business relations which the Associate has or had with any third party, company, agency, association, firm, person, corporation, or other entity.

**B.** Associate has not engaged in nor will engage in any business practice or behavior nor has taken nor will take any action which has or will result in any violation of any restrictions or covenants to which the Associate is subject pursuant to any agreement to which the Associate was heretofore a party.

## IX.  Miscellaneous

**A.** All capitalized terms used but not otherwise defined herein shall have the meaning set forth in that certain Glossary and Explanation of Terms published by WMA and in effect as of the date of this Agreement, a copy of which Associate acknowledges receipt. The Glossary and Explanation of Terms are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Any changes to the Glossary and Explanation of Terms shall be effective as of the date of general publication by WMA.

**B.** If any term of this Agreement controverts the express, or in the opinion of WMA's counsel, the intended provisions of any applicable regulatory authority or court decision, then said term shall be governed by said regulatory provision or decision and the subject term of this Agreement shall be deemed automatically amended or deleted as the case pertains. Should such amendment or deletion materially affect the substance of this Agreement, then this Agreement shall be subject to immediate termination upon written notice to the other party.

**C.** The Associate understands that the eligibility requirements for the sales position designations of "Marketing Director", "Qualified Marketing Director", "Senior Marketing Director", "National Marketing Director", "Executive Marketing Director", "CEO", and otherwise, as well as the obligations that are imposed upon the Associate in such positions shall be as are published from time to time and that said requirements may be changed from time to time, by WMA, and that such designations are within the sole discretion of WMA.

**D.** All notices or demands hereunder shall be sent either by certified mail, return receipt requested, postage and certified fees prepaid or by overnight courier service, addressed as follows: if to WMA, addressed to Administrator of Contracts, World Marketing Alliance, Inc., at its then principal home office address in Georgia; if to an officer, director or employee of WMA, then addressed to that person c/o World Marketing Alliance, Inc.; and if to the Associate, addressed to him/her at the address which appears on the first page of the WMA License Application Package. For purposes of this Agreement, the Associate shall maintain only one address at a time (the "Associate's Principal Address"), and shall immediately notify WMA of any change in the

Associate's Principal Address:

**E.** The failure or delay by any party to insist upon strict performance of the terms and conditions of this Agreement shall not be deemed a waiver of any subsequent breach or default in the terms hereof. Any waiver must be in writing and signed by the party granting the waiver.

**F.** Titles and headings of sections and subsections of this Agreement are for convenience and are not intended to encompass all of the provisions therein or to interpret such provisions.

**G.** If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

**H.** The Associate may not assign any rights or delegate any duties under this Agreement except as expressly provided herein. WMA may, from time to time, desire to assign to its affiliates or others all or a part of its rights and obligations hereunder (a "future assignment"); and the Associate consents and agrees to any such future assignment and agrees that, after any such future assignment, WMA shall be released from all obligations and liabilities so assigned, so long as such obligations and liabilities are assumed by the assignee.

**I.** If any Party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith.

**J.** This Agreement, including any Associate Agreement Rules constitutes the entire agreement and understanding between the parties hereto, unless another agreement is executed simultaneously with or subsequent to this Agreement by the parties which makes specific reference to this Agreement and expressly supplements or modifies this Agreement. No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding upon WMA unless in writing and signed by WMA.

**K.** Since the parties acknowledge that significant aspects of performance of this Agreement will occur in the State of Georgia, even though the business activities of the Associate may occur anywhere authorized, provisions of this Agreement (other than the provisions pertaining to the Covenants and Article II, Section N, as to which the parties do not specify an agreed upon choice of law) will be governed and construed under the laws of Georgia. If conflict or choice of law rules would choose a law of another jurisdiction, each party waives such rules and agrees (other than with respect to the Covenants and Article II, Section N) that the substantive law of Georgia shall nonetheless govern. The parties agree that, without waiver of their rights and obligations under Section V., unless expressly provided to the contrary in this Agreement, the state and federal courts of Georgia shall have exclusive jurisdiction of any litigation between the parties and the Associate expressly submits to the jurisdiction and venue of the federal and state courts sitting in Gwinnett County, Georgia or Cobb County, Georgia with respect to any such litigation.

**L.** The Associate agrees that WMA shall have the right to run credit, employment and other financial and background investigations on the Associate at any time WMA deems useful, whether such investigation is conducted by WMA or by an outside service or third party. The Associate consents to such investigations and consents to the disclosure of any person or entity to WMA of any financial, background and employment information conducted by WMA or by an outside service or third party.

**M.** As a condition to becoming a member of "World Marketing Alliance", the Associate is not required to purchase any of the Products and Services and is not required to pay WMA or the Preferred Companies any consideration except for the administrative fee to process his/her application for membership. Further, the Associate is not required to enter into any contract with WMA or the Preferred Companies in order to purchase any Products and Services.

**N.** The Associate irrevocably consents to and forever authorizes the use by WMA or anyone authorized by WMA, its legal representatives or assigns, the absolute and unqualified right to use all photographs in which the Associate has appeared for WMA and reproductions thereof, in which the Associate has been included in whole or part, made through any media without inspection or approval of the finished product or use to which it may be applied, in any manner WMA may desire, factually or fictionally, including the right to make adaptations of said material of every and any kind and character. For such purpose WMA may adopt, arrange, change, dramatize, make musical versions of, interpolate in, transpose, add to, and subtract from such photographs and reproductions to such extent as WMA, in its sole discretion, may desire, and in any language; and, further to obtain copyright in all countries on such use by WMA of such material in any form and upon any and all adaptations thereof to renew such copyrights. The Associate releases and discharges WMA, its assigns, agents, or licensees from any and all claims and demands that the Associate may have, which arise out of or in connection with the use of such photographs or reproductions, including but not limited to, any and all claims of libel, slander, and invasion of privacy. The Associate further releases WMA, its assigns, agents, or licensees from any liability of alterations, optical illusion or faulty mechanical reproduction. The Associate is over eighteen years of age and has read the above authorization and release prior to its execution.

The Associate hereby elects to be:  a Dedicated member _____ or a Non-Dedicated member _____
(Choose one and initial)                                         (please initial)                                         (please initial)

ASSOCIATE:                                         WORLD MARKETING ALLIANCE, INC.

                                         By: _____
Print Name                                         S. HUBERT HUMPHREY, JR.

Signature

Date:   8-22-00

# WORLD MARKETING ALLIANCE, INC.
## GLOSSARY AND EXPLANATION OF TERMS

The following sections ("Sections") define and explain additional terms which apply to and are part of the Associate's Associate Membership Agreement ("Agreement").

A. "Advance Commissions". Any monies that may be paid to Associate from any WMA Affiliate as an advance against Associate's commissions, or Associate's Override Compensation, either or both of which are yet to be earned, that may become due and payable by any WMA Affiliate.

B. "Associate Agreement Guidelines" and "Associate Agreement Rules". "Associate Agreement Guidelines" are those guidelines published in writing from time to time by WMA to WMA Associates containing sales position designations, performance standards, commission rates, and other matters affecting WMA Associates' compensation. "Associate Agreement Rules" are those rules published in writing from time to time by WMA to WMA Associate containing certain additional requirements imposed on WMA Associates as part of their contractual relationship with WMA. Associate Agreement Guidelines and Rules are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Associate Agreement Guidelines and Rules are not governed by the notice requirements of this Agreement, provided, however, that any changes set forth therein shall be effective as of the date of general publication.

C. "Corporate People". Any and all the officers, directors and employees of WMA or any WMA Affiliate, whether present or past and whether in their individual or their corporate capacities.

D. "Covenants". Those covenants set forth below in this Section D.

1. Valuable Assets of WMA. The Associate understands and acknowledges that WMA has developed, through the expenditure of considerable sums of monies, and owns, the following valuable, special and unique assets: i) a competent network of contractually affiliated sales associates/representatives who representatives are located throughout United States, but are and have been organized and trained, with the result that WMA is a highly effective marketing organization; ii) a lasting and sophisticated relationship with the Preferred Companies; and iii) the Customers particularly insofar as WMA receives primary compensation from sales of Products and Services to such Customers. The Associate understands and acknowledges that the commissions Associate earns from the sale of Products and Services constitute, in part, compensation for producing the property rights of WMA in its network of contractually affiliated sales associates/representatives and in the Products and Services sold by the Associate or his/her Downline Associates and for Associate's agreement herein not to violate or interfere with such property rights and not to breach the covenants set forth below.

2. Customer Non-Replacement. The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two years thereafter, directly or indirectly, individually or in concert with another, induce or attempt to induce any Customer to terminate, reduce coverage of or replace any of the Products and Services which have been sold by the Associate or his/her Downline Associates. In this Section D, the term "Customer" shall be limited during the two (2) year period after the Termination of this Agreement to those Customers i) to whom the Associate or his/her Downline Associates sold Products and Services; and ii) who reside, at the time of the inducement or attempted inducement, in the geographical area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding Termination of this Agreement. The Associate understands and acknowledges that this Section D(2) is not a non-solicitation covenant; it is a non-replacement covenant. For purposes of this Agreement the Associate's office shall mean that office or offices from which the Associate, during the eighteen (18) month period preceding Termination of the Agreement, conducts his/her business operations as an Associate of WMA. The Associate agrees and acknowledges that a breach of the Associate's promise in this Section D(2) would constitute wrongful interference with contractual rights of WMA.

3. Associate Non-Recruitment. The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two years thereafter, directly or indirectly: i) induce or attempt to induce any person who is contractually affiliated with WMA as an Associate or in any capacity, or any member of WMA's administrative staff, to terminate their relationship with WMA; or ii) hire, induce or attempt to hire or induce any persons to sell or solicit products and services which are competitive with the Products and Services for any person or entity other than WMA. Associate's covenants in the preceding sentence are limited and only apply with respect to any person that resided in or engaged in business activities in a geographic area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. The Associate acknowledges that any violation of this Section D(3) by the Associate with respect to any member of WMA's network of contractually affiliated sales associates/representatives constitutes wrongful interference with WMA's contractual relationship with such persons and WMA's and the Preferred Companies' administrative staffs.

4. Non-Disclosure Covenant. The Associate will not use, disseminate or reveal, other than on behalf of WMA as authorized by WMA or the Preferred Companies, while this Agreement is in force, or within two (2) years after Termination of this Agreement, any confidential information or trade secret of WMA or of the Preferred Companies, which the Associate has or hereafter receives, including any Customer or list of WMA Associates, whether received from WMA or any other person, or compiled by or on behalf of the Associate; provided, however, that confidential information does not include information which becomes generally available to the public other than as a result of disclosure by the Associate or any member of WMA's network of contractually affiliated sales associates. The Associate agrees that immediately upon the Termination of this Agreement he/she will return all documents, files and records containing any confidential information or trade secrets to WMA and the same shall not be copied or duplicated. For purposes of this Agreement the term "confidential information" means any and all confidential and proprietary data and information created by or belonging to WMA which has value to it and is not generally known by the competitors or potential competitors of WMA now or hereafter acquired or disclosed to the Associate.

5. Non-Solicitation. The Associate shall not, at any time during the term of this Agreement, directly or indirectly, individually or in concert with another, solicit or attempt to solicit, induce or attempt to induce any member of WMA's network of contractually affiliated sales associates/representatives to purchase any products and services other than the Products and Services.

6. Covenants of Other Associates and Harm to WMA. The Associate acknowledges that all members of WMA's network of contractually affiliated sales associates/representatives have executed agreements with WMA containing covenants identical or similar to the Covenants and that any such

Associate to induce or attempt to induce any member to breach any portion of his/her agreement with WMA would constitute wrongful interference with the contractual rights of WMA with such member. The Associate acknowledges that WMA would suffer extremely costly and irreparable harm, loss and damage if, during the term of the Covenants, the Associate should violate any of said Covenants.

7. Equitable Relief. The Associate acknowledges and agrees that, in the event that he/she were to violate or threaten to violate any of the Covenants WMA's recovery of damages would be inadequate to protect WMA. Accordingly, the Associate agrees that, in the event of a violation, actual or threatened of any such Covenants, WMA shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary. The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons the property rights of WMA which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected.

8. Reasonableness and Severability. The Associate acknowledges that the Covenants do not restrict the geographic areas in which the Associate ma. have Downline Associates and in which the Associate or such Downline Associates may solicit for the sale of Products and Services and that members ·· WMA's network of contractually affiliated sales associates/representatives frequently share offices with and have access to Customer information of othe members, whether or not in the Associate's hierarchy. Accordingly, the Associate acknowledges and agrees that the Covenants would be reasonable eve: with a much broader geographical limitation. The Associate understands that these Covenants constitute consideration for all post-termination accrual :: payment of any commissions, including Override Compensation. The Associate agrees that the Covenants are reasonable as to the Associate and necessar to protect the interest of WMA and that WMA would not associate with the Associate unless he/she entered into these Covenants. The Covenants and the acknowledgments and agreements contained in this Section D are severable and separate, and should a court determine any covenant or portion thereof to be unenforceable, it shall not affect the validity of any other paragraph of this Agreement or portion thereof. The Covenants and the acknowledgments and agreements in this Section D shall be construed as independent of any other provision in this Agreement, except (notwithstanding Article IX(G)) accrual and payment of commissions and Override Compensation. The existence of any other claim or cause of action of the Associate, whether predicated on this Agreement or otherwise, shall not constitute a defense to these Covenants or the acknowledgments.

9. Collateral Consequences. In addition to the rights WMA has to enforce the Covenants, the Associate agrees and understands that in the event of a: breach by him/her of any of the Covenants or the provisions of this Section D, whether during the term of or after the Termination of this Agreement : further commissions shall accrue or be payable to Associate by WMA or any WMA Affiliate, or shall be accrued or paid to reduce any Debit Balance, a: any Debit Balance shall thereafter be immediately due and payable by the Associate. Compliance with each of the Covenants is an express condition for th accrual, earning or payment of any commissions and Override Compensation by WMA or any WMA Affiliate and the parties do not intend for any paymer provisions under this Agreement to be enforceable by the Associate independent of his/her observance of these Covenants.

E. "Customers". Any person, or entity, from whom Associate, or any of Associate's Downline Associates solicits or attempts to solicit applications ··· Products and Services.

F. "Debit Balance". The balance remaining from time to time after subtracting the commissions and earned commissions actually earned but unpaid, whi: are due and payable by WMA or a WMA Affiliate to Associate, from any money and value owed (regardless of whether it is then due or not) by Associate · WMA or to any WMA Affiliate, including but not limited to expenses; license fees; commissions, and expenses that Associate is required to refund to WMA or a WMA Affiliate because of Customer or customer cancellations, rights of withdrawal, non-renewals, terminations, lapses or otherwise; Advan: Commissions; Debit Balances of Associate's Downline Associate(s); expenses and fees incurred by WMA or any WMA Affiliate in attempting to regist prospective downline Associates of Associate; WMA or any WMA Affiliate claims for indemnification against Associate; and other claims by WMA or a: WMA Affiliate against Associate; and any and all money and value which may be paid, advanced, or credited by or on behalf of WMA or any WMA Affiliate, to, or for the benefit of, Associate.

G. "Divestiture". Notwithstanding anything in this Agreement to the contrary, after Termination of this Agreement for any reason, Associate's violation : failure to comply with any promise, obligation, covenant, warranty or representation contained in this Agreement or in any Associate Agreement Guideline or Rule that survives the termination of this Agreement, which violation or failure results in the automatic forfeiture by Associate of Associate's right :: receive commissions.

H. "Downline Associate". Any Associate of WMA or of any WMA Affiliate upon whose sales, fees or revenue production Associate is entitled to ea: Override Compensation.

I. "Good Faith Arbitration". The procedures set forth in this Section I to resolve all Grievances, unresolved in the normal course of business, to the exte: that any Party wishes to pursue the matter further.

1. General. All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules, except that, or in addition to such Rules: · : order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be a: present or past owner, officer, director, employee, consultant, Associate, agent, registered representative, attorney or other representative of any insuran: company, insurance broker or insurance agency, securities broker, securities dealer or mortgage company, investment advisor, or of any affiliate of an : them; ii) the Parties may be entitled to such discovery and protective orders as provided herein; iii) the locale where the arbitration shall be held is : principal head office of WMA in Atlanta, Georgia or, if that location is not convenient for all Parties, they shall try to devise a way so that it is convenient. : if that location cannot be made convenient, at such other place as the Parties may agree, or, if they cannot agree, then as may be set by the Rules, as the cas may be: iv) a transcript shall be made on the proceeding; and v) the arbitrator's(s') award shall state their findings of fact and conclusions of law.

2. Judicial Review of Award. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application : petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the groun: stated in applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings : fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or :

compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award as reviewed by the court may be entered in any court having jurisdiction thereof.

Case 04:cv-00558-WSD Document 1 Filed 02/27/04 Page 52 of 87

3. Discovery, Protective Orders. Discovery (in the form of production of documents and depositions) of evidence pertinent and material to the Grievance, may be ordered by the arbitrator(s). The discovery shall be on such terms and at such times and locations as ordered by the arbitrator(s) and their orders may be enforced by courts of competent jurisdiction. In connection with all discovery and hearings regarding Good Faith Arbitration, the Arbitrator(s) shall have the power to enter such protective orders as are proper under the circumstances, and the protective orders may be enforced by courts of competent jurisdiction.

4. Waiver of Litigation. The Parties acknowledge and agree that, except as specifically provided to the contrary in this Agreement, this Section I is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. It is the intent of the Parties that except as specifically provided to the contrary in this Agreement, to the fullest extent allowed by law all Grievances, including any claims or defense (whether created or governed by federal, state or local law, rule or regulation) shall be resolved in an arbitral rather than a judicial forum. It is understood by the Parties that it is to their mutual benefit to submit Grievances that they are unable to resolve themselves for resolution by a neutral referee in an arbitral rather than a judicial forum. Those Parties recognize that by choosing Good Faith Arbitration as the mechanism for resolving Grievances, each Party expects to ensure a more expeditious and economical resolution of their Grievances than is available in most cases in a judicial forum. Accordingly, except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

5. No Condition Precedent to Action and Power of Arbitrators. Anything herein or elsewhere contained to the contrary notwithstanding, WMA shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary or permanent injunctive relief.

6. Extraordinary Relief. The Parties agree that WMA has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Article VI of this Agreement without complying with Article V of the Agreement or this Section I. Without limitation, the Parties agree that the requirements for Good Faith Arbitration under Article V the Agreement or this Section do not preclude WMA from seeking an arbitral or in a judicial forum, or in both. Extraordinary Relief to protect its rights under Article VI of the Agreement. Neither Article V of the Agreement or this Section I shall be deemed to preclude or narrow the judicial or arbitral power regarding Extraordinary Relief.

7. Statute of Limitations. Unless otherwise tolled or satisfied with respect to Good Faith Arbitration, a demand for arbitration must be filed under Rules within the time prescribed by the applicable statutes of limitations.

8. Beneficiaries. The Associate and WMA intend and agree that all of the Corporate People shall be Beneficiaries of all of the provisions of Section I and that as Beneficiaries and as Parties, they, or any of them shall have the right to enforce all provisions of this Section I to the same extent WMA and the Associate.

J. "Grievance". Any controversy, claim or dispute arising out of or relating to this Agreement, between the Associate, on the one part, and WMA and/or of the Corporate People, or any of them, on the other part.

K. "Indemnified Losses". Any and all liability, claims, demands, proceedings, obligations, assessments, loss, cost, damage and expense, of any nature whatsoever, contingent or otherwise (including, without limitation, any and all judgments, decrees, equitable relief, extraordinary relief, settlements, award attorney's fees, court costs, punitive damage and arbitration costs including arbitrators' fees).

L. "Indemnified Party". WMA and the Corporate People.

M. "Products and Services". Those products and services selected, approved and designated from time to time by WMA for which Associate may submit applications.

N. "Override Compensation". Those commissions that are earned by an Associate from sales of Products and Services made by other WMA Associates; those commissions that are earned by a Associate from sales of products and services made by sales representatives or contractors of any WMA Affiliate accordance with commission schedules, rules and regulations issued by WMA or any WMA Affiliate from time to time. Override Compensation is earn only for the faithful performance of Associate's obligations under this Agreement, including, but not limited to, those obligations relating to Associate Downline Associates.

O. "Preferred Companies". Those companies with whom WMA has established a contractual relationship authorizing Associates of WMA to solicit sale Products and Services for such companies; and those companies with whom any WMA Affiliate has established a contractual relationship authorizing representatives or contractors of any WMA Affiliate to solicit sales of products and services for such companies.

P. "Prohibited Actions". Associate is prohibited from, and agrees that Associate shall not: i) collect from Customers, in payment of the purchase Products and Services, cash, or checks made payable other than to the appropriate Preferred Company, custodian bank or transfer agent relating to purchases, all as designated by WMA; ii) offer to sell any products and services unless such are Products and Services, except as otherwise express forth in this Agreement; iii) offer or sell any Products and Services unless there exists at the time of such offer or sale an effective agreement between and the Preferred Company, if any, making available such services; iv) make, alter or discharge on behalf of WMA any contract or investment, or warr provision other than in strict compliance with the terms and conditions of all applicable laws and in accordance with this Agreement and the procedure manuals, guidelines, rules and regulations with this Agreement and of WMA; or v) make any misrepresentation, or improperly induce a Customer purchase Products and Services.

Q. "Roll Up". The transfer, with recourse, of the Debit Balance of a downline Associate to that downline Associate's first above Upline Associate. The term Roll Up includes the transfer, with recourse, from a Downline Associate to Associate, and also from Associate to the first above Upline Associate. All Roll Ups are with full recourse and the Associate (including the Associate from whom the Debit Balance is Rolled Up) shall remain liable for the Debit Balance, and all interest and liability in connection therewith, to both WMA or any WMA Affiliate and to all upline Associates (including Upline Associates) who suffer the Roll Up. In the event that any portion of a Downline Associate's Debit Balance is Rolled Up to the Associate in accordance with the terms of Associate's Associate Membership Agreement, including the Associate Agreement Guidelines or Rules, or Associate's agreements with WMA Affiliates, and WMA or any WMA Affiliate directly or indirectly collects said Debit Balance from the Associate, then WMA or any WMA Affiliate may authorize in writing the Associate to collect the Debit Balance from the Downline Associate. If said Downline Associate repays his/her Debit Balance to WMA or a WMA Affiliate, then the Associate will be credited for the amount repaid; if the Associate collects any portion of the Debit Balance from the Downline Associate, such portion must be remitted to WMA or a WMA Affiliate by the Associate and the Associate will be credited the amount remitted. If such Rolled Up Debit Balance is not paid by Associate within ninety (90) days, such Rolled Up Debit Balance shall be Rolled Up from Associate to Associate's Upline Associate who shall become liable therefore to WMA or the WMA Affiliate, as the case may be. In the event the Associate's Debit Balance is Rolled Up to an Upline Associate and WMA or a WMA Affiliate collects said Debit Balance from the Upline Associate, then such Upline Associate shall have all the legal rights and remedies WMA or the WMA Affiliate would have to require the Associate to repay his/her Debit Balance. Anything herein contained to the contrary notwithstanding, in any case where Associate or an Upline Associate suffers a Roll Up, the liability for payment of that Roll Up by Associate or Upline Associate shall be limited to deduction by WMA or a WMA Affiliate from amounts owed by WMA or a WMA Affiliate to Associate and Upline Associate, and to the Downline Associates who caused the Roll Up.

R. "Rules". Where required to be applied, the Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance.

S. "Termination". The occurrence of any of the following: i) the automatic termination, without notice, upon: the death of Associate, or the revocation, termination or non-renewal of any of the Associate's licenses and registrations with any regulatory agencies; ii) the termination by Associate at any time without any reason or any cause, effective upon the delivery of written notice to WMA, or iii) the termination by WMA at any time for "cause", effective upon the delivery of written notice to Associate. For purposes of this Agreement, Associate agrees and acknowledges that any of the following will be "cause" for termination of this Agreement by WMA: Associate's violation of any federal or state law or regulation; Associate becomes subject to sanction or censure by any state or federal regulatory agency or body; Associate becomes temporarily or permanently enjoined from acting as a sales associate or WMA or conducting his/her business or performing any of his or her duties under this Agreement or from acting in any of the various capacities relating to the insurance or financial services business; Associate is censured, suspended or disciplined in respect to the violation of any law, rule, or regulation regarding the purchase or sale of any products and services, including the Products and Services, misappropriation or commingling of premiums or payments for any Products and Services; engaging in a fraudulent act or misrepresenting characteristics or benefits of the Products and Services; any interference with the collection of renewal premiums; Associate violates any law or regulation that governs the conduct of any part of Associate's business; Associate is indicted or subject to trial for any crime involving moral turpitude; Associate breaches any provision of or fails to perform or observe any obligation under this Agreement or any other agreement that the Associate may have, now or hereafter, as a member of "World Marketing Alliance"; Associate fails to timely discharge any monetary obligations to WMA or any WMA Affiliate; Associate engages in any activity which, in the sole opinion of WMA, may adversely affect the good name and reputation of WMA; any act or condition of Associate that, in the sole opinion of WMA, may cause professional, business or financial instability of Associate; Associate's failure to comply with the procedures, manuals, rules, and regulations promulgated from time to time by WMA, including the Associate Agreement Rules and the WMA Manual; Associate's admitting in writing Associate's inability to pay debts as they become due, executing an assignment or similar document for the benefit of Associate's creditors, or the appointment of a receiver or trustee or similar officer regarding Associate's property; any false or incorrect statements made by Associate in any application to a regulatory authority; termination for any reason of any agreement between Associate and any WMA Affiliate or Preferred Company; or the failure of Associate to comply with WMA's annual compliance review and review procedure. At WMA's discretion, instead of immediately terminating this Agreement, WMA may impose suspension of Associate's benefits and rights and privileges, including suspension of rights to solicit for Products and Services and suspension and loss of commissions, and may impose other disciplinary action, without liability to Associate for loss or otherwise. Suspension or disciplinary action shall not in any way preclude or diminish WMA's rights to terminate this Agreement at any time. In the event of termination of this Agreement by either party, WMA shall be entitled to notify the Preferred Companies to terminate the Associate's contract(s) if any, with the Preferred Companies, and Associate acknowledges and agrees that neither WMA nor the Preferred Companies shall have any liability for any loss, damage or otherwise resulting from such termination by the Preferred Companies or notice from WMA.

T. "Upline Associate". Any Associate of WMA or any WMA Affiliate entitled to earn Override Compensation upon the sales activities of Associate.

U. "Vested". The right of Associate to receive commissions and Override Compensation after Termination of this Agreement, unless and until Divestiture occurs. If Associate becomes Vested, then, in the event that this Agreement terminates due to Associate's death, WMA shall pay the commissions and Override Compensation to Associate's estate or, if specifically designated in writing by Associate, to Associate's surviving spouse

V. "WMA Manual". WMA's field manual as in effect from time to time. The WMA Manual will be amended from time to time and WMA will provide Associate with such amendments.

W. "WMA Affiliate". Any legal entity which is under common control with WMA. Common control for this purpose shall mean ultimate stock ownership of 20% or more by the same person(s).

# Freepoint, LLC.
## Associate Membership Agreement

**THIS AGREEMENT** is made by and between Freepoint, LLC. (hereinafter referred to as "Freepoint"), and the undersigned individual (hereinafter referred to as the "Associate").

**WHEREAS**, the Associate desires to become a member of Freepoint sales force (hereinafter referred to as "Freepoint" and further defined herein) which will be composed of a group of independent contractors ("members") who enter into agreements with Freepoint pursuant to which they become authorized to engage in the business of selling products including insurance and other financial service Products and Services offered by Freepoint and companies with which Freepoint is or may hereafter become affiliated, directly, indirectly, through common ownership, by contractual agreement, or otherwise ("Freepoint Affiliated Companies"). For purposes of this Agreement, any reference hereinafter made to Freepoint shall be deemed to constitute a reference to all of the Freepoint Affiliated Companies; and

**WHEREAS**, Freepoint has established a contractual relationship with one or more companies (collectively, the "Preferred Companies", or individually, a "Preferred Company") authorizing Freepoint or the members of Freepoint to market and sell various Products and Services and to recommend and designate members of Freepoint for appointment with the Preferred Companies as independent sales representatives with respect to such various Products and Services; and

**WHEREAS**, Freepoint is continually recruiting new members to Freepoint and desires to have the Associate become a member of Freepoint by entering into a written agreement with the Associate which establishes and defines the terms and conditions of the Associate's membership in Freepoint.

**NOW, THEREFORE**, in consideration of the premises, the mutual promises and covenants in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, and intending to be legally bound hereby, Freepoint and the Associate agree as follows:

## I. Membership in Freepoint

A. The Associate hereby agrees to become a member of Freepoint and to abide by the terms and conditions of membership as hereinafter set forth in this Agreement. The Associate understands that Freepoint has the right to promulgate and publish rules and requirements relative to membership in Freepoint. Freepoint expressly reserves its right to have final approval and control over all contracts, rights, and obligations that relate, in any way, to Associate's membership in Freepoint.

B. There are two (2) types of members in Freepoint: Dedicated and Non-Dedicated. Dedicated members are those persons who have made a decision to market for sale only those Products and Services marketed by Freepoint. Non-Dedicated members are those persons who have made a decision to market the Products and Services and other products and services not marketed by Freepoint. Although the membership terms of Dedicated and Non-Dedicated members will be identical in some respects, Dedicated members will be accorded certain benefits not available to Non-Dedicated members. Such benefits are described herein and in Associate Agreement Rules and Guidelines as published from time to time by Freepoint.

## II. Associate's Duties As A Member

A. As a member of Freepoint the Associate promises that he/she will do the following:

1. Use his/her best efforts to sell and promote the sale of the Products and Services;

2. If a Dedicated member, not be involved or associated in any manner with any hierarchal sales organization of any kind in which commissions are paid based on multi-generational levels without the written permission of Freepoint;

3. If a Dedicated member, not market or sell any products or services other than the Products and Services;

4. If a Non-Dedicated member, Associate agrees to disclose and notify Freepoint in writing as to the general nature of Associate's involvement and/or affiliation with any other business or company;

5. Not market or sell any non-Freepoint products or services to any member or prospective member of Freepoint;

6. Preserve the good name and reputation of Freepoint and not do anything that will damage the name and reputation of Freepoint;

7. Comply with all rules and guidelines set forth in the Associate Agreement Rules and Guidelines currently published by Freepoint or as may be published from time to time by Freepoint;

1

Initials_____

8.      Comply with all of the terms and conditions of any contract(s) into which Associate enters with Freepoint and the Preferred Companies;

9.      Participate in the training that will be provided by Freepoint.

10.     Refrain from selling or soliciting for sale any Products and Services that require licensing or registration with a Preferred Company or Freepoint Affiliated Companies until the Associate receives written notice from Freepoint or the Preferred Company that the Associate has been approved to market such Products and Services;

11.     Execute such further agreements and obtain such licenses that Freepoint determines to be required for the Associate to be lawfully authorized to sell any of the Products and Services; and

12.     Diligently fulfill supervisory responsibilities with respect to Downline Associates.

B. The Associate understands and acknowledges that Freepoint is in the business of building Freepoint to provide Products and Services to the consuming public and Freepoint is a valuable asset of Freepoint. The Associate acknowledges that Freepoint owns all rights in and to the following: (i) Freepoint, which, for purposes of this Section 11.13, includes all persons who have in force Associate Membership Agreement with Freepoint, (ii) the identities of and all lists of the members comprising Freepoint; and (iii) the identities of and all lists of the Customers produced by Freepoint (even though the Associate may not have recruited any of the members or produced any of the Customers) which constitute property owned solely by Freepoint. Associate agrees that Associate shall have no proprietary interest in, or ownership of, any Customers, other Associates of Freepoint including Downline Associates, or Products and Services. Freepoint shall have exclusive proprietary interest in, or ownership, of all Customers and contractual relationships with other Associates and the Preferred Companies.

C. As a member of Freepoint, the Associate is not an employee of Freepoint. Instead, the Associate's relationship with Freepoint is that of an independent contractor. Nothing in this Agreement shall be construed to constitute the Associate as a partner, employee or agent of Freepoint, nor shall Freepoint, the Preferred Companies or the Associate have any authority, except as expressly provided herein, to bind the other, it being the intention that each shall remain an independent contractor responsible for his/her own actions. Subject to all applicable local, state and federal laws and regulations, this Agreement, Associate Agreement Guidelines and Rules, other instructions, procedures, etc., published by Freepoint and any contract(s) between the Associate and the Preferred Companies, the Associate shall conduct and control his/her business activities, work hours, selection of Customers, office location and sales methods. Even though a state license or form may designate the Associate as an "employee" of Freepoint or the Preferred Companies, such designation will not change the fact that by definition and by practice the Associate is an independent contractor. As an independent contractor, the Associate shall be responsible for paying any and all federal, state, city or other taxes that may become payable with respect to any compensation the Associate may receive under the terms of this Agreement.

D. Associate shall promptly pay all expenses relating to the performance of Associate's duties under this Agreement, including but not limited to indebtedness to Freepoint and premium costs of errors and omissions insurance required by Freepoint. Associate shall be solely responsible for all of his/her expenses, including but not limited to travel, entertainment, office, signs, telephone, education, dues, subscriptions, licenses, etc., and shall receive no remuneration or reimbursement of any nature whatsoever other than the commissions referred to herein. Company shall not provide any facilities, furniture, or equipment to Associate. Associate shall provide his/her own office, telephone, supplies, transportation, and all other facilities, which Associate, may deem necessary.

E. Associate shall supervise the Freepoint-related activities of Associate's Downline Associates and use Associate's best efforts and continuing diligence in directing Associate's Downline Associates to comply with their respective Associate Membership Agreements with Freepoint and in training and providing assistance to Associate's Downline Associates, all in accordance with Freepoint policies and procedures, including those contained in the Associate Agreement Rules and Guidelines. Associate's fulfillment of such supervisory and training responsibilities is an essential requirement of Associate's compliance with this Agreement.

F. Associate shall, as required to sell Products and Services, be duly licensed in each jurisdiction in which and from which Associate solicits, offers, or obtains applications and orders for purchase of Products and Services and in each jurisdiction, where required by law, in which and from which Associate receives any compensation, including Override Compensation. Associate will bear the cost of all initial and renewal fees for licensing and registrations, and will make payment as instructed by Freepoint.

G. Associate shall maintain accurate and current records of all transactions entered into pursuant to this Agreement. Such books and records shall conform to the requirements of federal and state laws, the rules and regulations of appropriate regulatory agencies and the policies and procedures of Freepoint and of Associate's branch office to which Associate reports. Associate shall maintain an accurate and current file of all commission statements and other records and correspondence received from Freepoint and notify Freepoint in writing within thirty (30) days of Freepoint mailing such statements, records and correspondence, if any of them is inconsistent with Associate's records or, in the opinion of Associate, not accurate, As to any statements, records or correspondence furnished by or on behalf of Freepoint to Associate, If Associate does not furnish Freepoint with written objections or corrections within thirty (30) days of mailing by Freepoint, then Associate shall be deemed to have approved such statements, records and correspondence as to any matter not objected to or corrected, and to have released Freepoint from liability and responsibility for all matter contained therein.

2

Initials_____

H. Associate shall not use sales material of any kind, which has not been approved in writing by Freepoint for such use, including but not limited to any type of form letter or correspondence. Without the prior written approval of Freepoint, Associate shall not use any form of media, including but not limited to radio, newspaper, the Internet, television, letters, business cards, letterhead, or photocopies, to promote sales. The Associate promises not to use the name "Freepoint" in conjunction with any notation indicative of a business organization, such as "Corporation", "& Company", "Ltd" "Inc.", or "& Associates", unless the Associate is specifically granted written permission from Freepoint to do so. The Associate may not appropriate the name "Freepoint" for use in any corporate name, joint venture or partnership.

I. All activities conducted by Associate under this Agreement shall be conducted in accordance with all applicable laws. Associate also has the duty to faithfully abide by the rules and regulations set forth in the Associate Agreement Rules and Guidelines that may be issued from time to time, other instructions, procedures, etc., published by Freepoint as amended from time to time, and all applicable bulletins or memoranda issued by the Preferred Companies. Associate shall immediately advise Freepoint of any action or fact whatsoever which comes to Associate's knowledge which may possibly constitute a violation of any applicable laws or regulations with respect to Freepoint, Associate or any party who is, has been, or may be doing business with Freepoint. The Associate's failure to comply with, or failure to cause his/her Downline Associates to comply with, this Agreement or Associate Agreement Rules and Guidelines constitutes a material breach of this Agreement.

J. Freepoint has contracted with one or more insurance companies to provide Freepoint and its independent contractors with group plans for errors and omissions and fidelity insurance coverage. Associate is required to participate in these group plans and monthly insurance premiums will be deducted by Freepoint from commissions due to Associate. If Associate's commissions are insufficient to cover the monthly insurance premiums, then Freepoint shall have the right to direct any Freepoint Affiliate to offset such deficit against any earned commissions due to Associate, or, at the option of Freepoint, Associate may be billed for the total amount of accrued insurance premiums and such amount will be paid in full by Associate within fifteen (15) days of the billing date, otherwise this Agreement may be terminated by Freepoint in its sole discretion. Freepoint specifically reserves the right to modify insurance premiums charged without prior notice.

K. Associate shall not take, undertake or engage, directly or indirectly, in any Prohibited Actions.

L. Associate acknowledges and agrees that all supplies, including but not limited to prospectuses, memoranda, visual aids, specimen plan forms, manuals, statistical and sales training and/or recruitment materials, vendor materials and brochures, furnished by Freepoint to Associate are and shall be the property of Freepoint and shall be returned promptly to Freepoint upon demand.

M. Associate shall comply with the terms, conditions and restrictions on use contained in any and all license or other contractual agreements between third party owners of any computer software and Freepoint, pursuant to which Freepoint has obtained the right to use such computer software. Associate further agrees to comply with the terms of any license or other contractual agreement into which Associate is required to enter with any third party computer software owner.

N. Associate shall not violate the Covenants.

## III. Associate's Compensation

A. The Associate acknowledges and understands that the Associate earns income only from the sale of the Products and Services and no income is earned by or paid to Associate for recruiting. The Associate's sole compensation under and during the term of this Agreement shall be commissions paid by, or caused to be paid by, Freepoint pursuant to this Agreement and paid in the manner provided in, and subject to the terms and conditions contained in, those Associate Agreement Guidelines and commission schedules, which are published by Freepoint from time to time. The Preferred Companies are generally not obligated to pay the Associate any money. There is no guarantee that the Associate will be financially rewarded solely by virtue of becoming a member of Freepoint.

B. Freepoint will publish Associate Agreement Guidelines and commission schedules from time to time which relate to sales position designations, performance standards, commission rates of Freepoint or the Preferred Companies and other matters affecting the terms of the members' compensation. Freepoint may, from time to time, in the exercise of its sole discretion, and without notice, increase or decrease the rates and amounts of commissions or the sales position of Associate; provided, however, that any such changes may be prospective only, but may affect any new business and any commissions earned thereafter on existing business.

C. Associate acknowledges and agrees that Associate's commissions are a share of Freepoint's commissions and Associate's commissions are earned by, and shall be payable to, Associate only after all of the following have occurred: i) the order or application for Products and Services are accepted and approved by Freepoint or a Preferred Company at its principal office, or by an approved Freepoint designee; ii) actual payment for the same has been made by and received from the Customer; and iii) Freepoint has actually received payment from a Preferred Company, if applicable, of Freepoint commission (subject to the terms of this Agreement).

D. Any money and value owed by Associate to Freepoint, any Debit Balance, and any money and value which has been advanced or credited by or on behalf of Freepoint, or for the benefit of, Associate, represents a loan and may be offset and deducted by Freepoint from any commissions or other money or value then or thereafter owed by Freepoint to Associate. Freepoint is hereby authorized by Associate to deduct from commissions due the amount of any commissions paid to Associate in connection with any payment or amount that Freepoint refunds to Associate's Customer.

3

Initials_____

E. All Debit Balances shall be repaid immediately by Associate upon notice thereof to Associate by Freepoint. Any Debit Balances not paid within thirty (30) days from the effective date of such notice shall bear interest from the end of such thirty (30) days at a rate equal to the maximum legal rate of interest provided by applicable law. From time to time in its sole discretion. Freepoint or a Freepoint Affiliate may cause a reduction in all or any portion of the Associate's Debit Balance in any of the following ways: i) by applying any commissions or other forms of compensation payable to the Associate by Freepoint to reduce the Associate's Debit Balance: or ii) by exercising any other legal rights and remedies available to Freepoint, including any rights or remedies that are included in Associate Agreement Guidelines and Rules. The Associate is also obligated to repay Freepoint for the Debit Balances of any of Associate's Downline Associates. The formula and procedure for this Debit Balance repayment is more specifically set out in the Associate Agreement Rules.

F. Except as otherwise provided in this Agreement, and subject to the terms of this Section III.F. if and when Associate qualifies for and attains certain sales position designations established by Freepoint from time to time pursuant to Associate Agreement Guidelines, Associate shall become Vested and entitled to receive commissions upon termination. However Associate acknowledges and agrees that since Associate's commissions are a share of Freepoint's commissions, Associate shall, upon becoming Vested, be vested in commissions only to the extent that Freepoint actually receives commissions with respect to the applicable Customers from the Preferred Companies and Associate can legally receive such commissions. In the event that Associate, at the time of termination, has not qualified and attained the sales position designation(s) established by Freepoint as a condition to becoming Vested, Associate shall have no right to commissions or any compensation of any kind.

G. In the exercise of its sole discretion, Freepoint reserves the right to, and may, refund to any Customer all or any part of payments made by Customer, and Associate agrees to promptly reimburse Freepoint for its expenses in connection therewith. Associate further agrees to promptly repay Freepoint all commissions due or that may become due to Associate hereunder, the amount due Freepoint for any such expenses or commissions to be repaid by Associate.

H. Except as set forth above in Sections III.A. and III.F., Associate shall receive no other compensation of any kind whatsoever under this Agreement. Associate will not receive any fringe benefits under this Agreement whatsoever, including but not limited to insurance benefits, disability income, paid vacation, expense reimbursement or retirement benefits unless otherwise specifically provided for in this Agreement.

## IV. Term and Termination

A. This Agreement shall continue in effect until Termination.

B. Upon the Termination of this Agreement, all commissions due to Associate prior to the effective date of Termination of this Agreement shall be paid by Freepoint to Associate within a reasonable period of time. Except which are for commissions which Associate may become entitled to receive if Associate becomes Vested in accordance with Section III.F. of this Agreement, which are subject to Divestiture as defined in the Glossary, no further compensation, other than the commissions earned as of the effective date of Associate's Termination, shall be payable to Associate under this Agreement after Termination. However, Freepoint shall have the right to offset against any commissions, any Debit Balance, indebtedness owed by Associate to Freepoint, or any charges Freepoint deems appropriate to be charged to Associate. Upon Termination of this Agreement, any Debit Balances then or thereafter outstanding, and any Debit Balances that may thereafter exist, shall without notice immediately become due and payable and shall bear interest at the highest rate permitted under applicable law until paid. Associate shall promptly surrender to Freepoint all books and records relating to Freepoint including but not limited to all applications and payments which Associate may have in his/her possession or under his/her control at the time of Termination.

## V. Arbitration of Grievances

The Parties agree that, except as specifically provided to the contrary in this Agreement any Grievance shall be resolved exclusively by Good Faith Arbitration .

## VI. Extraordinary Relief

The Associate acknowledges that Freepoint would suffer extremely costly and irreparable harm, loss and damage if any of the provisions of this Agreement are violated by the Associate. The Associate agrees that Freepoint shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by the Associate of this Agreement and that Freepoint may seek Extraordinary Relief in the federal and state courts of the State of Arizona, in any court of competent jurisdiction outside the State of Arizona, as well as in Good Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

4

Initials_____

## VII. Associate's Promise to Indemnify and Assign

A. The Associate agrees to indemnify and hold harmless, from and against any and all Indemnified Losses which are incurred, sustained, suffered, or assessed against the Indemnified Party, or all or any combination thereof, because of, arising out of or as a result of any acts or omissions, including but not limited to a breach of Section II N. or any breach of Associate's contract(s) with Preferred Companies, by the Associate and also any of Associate's Downline Associates. The Indemnified Party shall be entitled to use counsel of its own choosing, shall be entitled to determine the validity of the Indemnified Loss and shall not be required to notify the Associate of the existence or progress of any claims or Indemnified Loss as a condition precedent to requiring payment by the Associate to the Indemnified Party for an Indemnified Loss.

B. To secure the Associate's promise of indemnification and the Associate's obligation to repay his/her Debit Balance or his/her Downline Associates' Debit Balances, the Associate hereby assigns to Freepoint and grants, and agrees to, from time to time, execute any additional instruments or documents necessary to perfect, a continuing security interest to Freepoint in all commissions (or advances thereon) otherwise payable to the Associate by Freepoint, to the extent necessary to satisfy Freepoint for any such Indemnified Loss or any such Debit Balance obligations. This assignment is given to Freepoint to secure the Associate's obligations as set forth above and elsewhere in this Agreement. Freepoint has the right to withhold commissions in connection with this indemnity.

## VIII. Representations and Warranties

A. The Associate expressly represents and warrants that the Associate has the authority to enter into this Agreement and that the Associate is not and will not, by virtue of entering into this Agreement and consummating the transactions contemplated hereby, or otherwise, be in breach of, violate, or interfere with, any other contract, agreement, or business relations which the Associate has or had with any third party, company, agency, association, firm, person, corporation, or other entity.

B. Associate has not engaged in nor will engage in any business practice or behavior nor has taken nor will take any action that has or will result in any violation of any restrictions or covenants to which the Associate is subject pursuant to any agreement to which the Associate was heretofore a party.

## IX. Miscellaneous

A. All capitalized terms used but not otherwise defined herein shall have the meaning set forth in that certain Glossary and Explanation of Terms published by Freepoint and in effect as of the date of this Agreement a copy of which Associate acknowledges receipt. The Glossary and Explanation of Terms are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Any changes to the Glossary and Explanation of Terms shall be effective as of the date of general publication by Freepoint.

B. If any term of this Agreement controverts the express, or in the opinion of Freepoint's counsel, the intended provision of any applicable regulatory authority or court decision, then said term shall be governed by said regulatory provision or decision and the subject term of this Agreement shall be deemed automatically amended or deleted as the case pertains. Should such amendment or deletion materially affect the substance of this Agreement, this Agreement shall be subject to immediate termination upon written notice to the other party.

C. The Associate understands that the eligibility requirements for certain sales position designations, as well as the obligations that are imposed upon the Associate in such positions shall be as are published from time to time and that said requirements may be changed from time to time, by Freepoint, and that such designations are within the sole discretion of Freepoint.

D. All notices or demands hereunder shall be sent either by certified mail, return receipt requested, postage and certified fees prepaid, electronic mail or by overnight courier service, addressed as follows: if to Freepoint, addressed to Administrator of Contracts, Freepoint, LLC at its then principal office address; if to an officer, director or employee of Freepoint, then addressed to that person c/o Freepoint, LLC; and if to the Associate, addressed to him/her at the address which appears on the first page of the Freepoint Appointment Application Package. For purposes of this Agreement, the Associate shall maintain only one address at a time (the "Associate's Principal Address"), and shall immediately notify Freepoint of any change in the Associate's Principal Address.

E. The failure or delay by any party to insist upon strict performance of the terms and conditions of this Agreement shall not be deemed a waiver of any subsequent breach or default in the terms hereof. Any waiver must be in writing and signed by the party granting the waiver. An officer designated by Freepoint must sign any waiver granted by Freepoint.

F. Titles and headings of sections and subsections of this Agreement are for convenience and are not intended to encompass all of the provisions therein or to interpret such provisions.

G. If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

5

Initials_____

H. The Associate may not assign any rights or delegate any duties under this Agreement except as expressly provided herein. Freepoint may, from time to time, desire to assign to its affiliates or others all or a part of its rights and obligations hereunder (a "future assignment"); and the Associate consents and agrees to any such future assignment and agrees that, after any such future assignment, Freepoint shall be released from all obligations and liabilities so assigned, so long as such obligations and liabilities are assumed by the assignee.

I. If any party hereto commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith.

J. This Agreement, including the Glossary and Explanation of Terms and any Associate Agreement Rules constitutes the entire agreement and understanding between the parties hereto, unless another agreement is executed simultaneously with or subsequent to this Agreement by the parties which makes specific reference to this Agreement and expressly supplements or modifies this Agreement. No change, amendment, termination or attempted waiver of any of the provisions hereof shall be binding upon Freepoint unless in writing and signed by an officer designated by Freepoint.

K. Since the parties acknowledge that significant aspects of performance of this Agreement will occur in the State of Arizona, even though the business activities of the Associate may occur anywhere authorized, provisions of this Agreement (other than the provisions pertaining to the Covenants and Article 11, Section N, as to which the parties do not specify an agreed upon choice of law) will be governed and construed under the laws of Arizona. If conflict or choice of law rules would choose a law of another jurisdiction, each party waives such rules and agrees (other than with respect to the Covenants and Article 11, Section N) the substantive law of Arizona shall nonetheless govern. The parties agree that, without waiver of their rights and obligations under Section V., unless expressly provided to the contrary in this Agreement, the state and federal courts of Arizona shall have exclusive jurisdiction of any litigation between the parties and the Associate expressly submits to the jurisdiction and venue of the federal and state courts sitting in Maricopa County, Arizona with respect to any such litigation.

L. The Associate agrees that Freepoint shall have the right to run credit, employment and other financial and background investigations on the Associate at any time Freepoint deems useful, whether such investigation is conducted by Freepoint or by an outside service or third party. The Associate consents to such investigations and consents to the disclosure by any person or entity to Freepoint of any financial, background and employment information conducted by Freepoint or by an outside service or third party.

M. As a condition to becoming a member of Freepoint, the Associate is not required to purchase any of the Products and Services and is not required to pay Freepoint or the Preferred Companies any consideration except for the administrative fee to process his/her application for membership, including but not limited to said background investigations. Further, the Associate is not required to enter into any contract with Freepoint or the Preferred Companies in order to purchase any Products and Services.

N. The Associate irrevocably consents to and forever authorizes the use by Freepoint or anyone authorized by Freepoint, its legal representatives or assigns, the absolute and unqualified right to use all photographs in which the Associate has appeared for Freepoint and reproductions thereof, in which the Associate has been included in whole or part, made through any media without inspection or approval of the finished product or use to which it may be applied, in any manner Freepoint may desire, factually or fictionally, including the right to make adaptations of said material of every and any kind and character. For such purpose Freepoint may adopt, arrange, change, dramatize, make musical versions of, interpolate in, transpose, add to, and subtract from such photographs and reproductions to such extent as Freepoint, in its sole discretion, may desire, and in any language; and, further to obtain copyright in all countries on such use by Freepoint of such material in any form and upon any and all adaptations thereof to renew such copyrights. The Associate releases and discharges Freepoint, its assigns, agents, or licensees from any and all claims and demands that the Associate may have, which arise out of or in connection with the use of such photographs or reproductions, including but not limited to, any and all claims of libel, slander, and invasion of privacy. The Associate further releases Freepoint, its assigns, agents, or licensees from any liability of alterations, optical illusion or faulty mechanical reproduction. The Associate is over eighteen years of age and has read the above authorization and release prior to its execution.

ASSOCIATE:                                    FREEPOINT:

_____                       _____
Print Name                                    Colin Buckingham


_____
Signature


_____
Date

6

Initials _____

## FREEPOINT, LLC.
## GLOSSARY AND EXPLANATION OF TERMS

The following sections ("Sections") define and explain additional terms, which apply to and are part of the Associate's Associate Membership Agreement ("Agreement").

A. "Advance Commissions". Any monies that may be paid to Associate as an advance against Associate's commissions, or Associate's Override Compensation, either or both of which are yet to be earned, that may become due and payable by Freepoint.

B. "Associate Agreement Guidelines" and "Associate Agreement Rules". Associate Agreement Guidelines are those guidelines published from time to time by Freepoint to Associates containing sales position designations, performance standards, commission rates, and other matters affecting Freepoint Associates' compensation. Associate Agreement Rules are those rules published in writing from time to time by Freepoint to Associates containing certain additional requirements imposed on Freepoint Associates as part of their contractual relationship with Freepoint. Associate Agreement Guidelines and Rules are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement. Associate Agreement Guidelines and Rules are not governed by the notice requirements of this Agreement; provided, however, that any changes set forth therein shall be effective as of the date of general publication.

C. "Corporate People". Any and all of the officers, directors and employees of Freepoint, whether present or past and whether in their individual or their corporate capacities.

D. "Covenants". Those covenants set forth below in this Section D.

1. Valuable Assets of Freepoint. The Associate understands and acknowledges that Freepoint has developed, through the expenditure of considerable sums of monies, and owns, the following valuable, special and unique assets: i) a competent network of contractually affiliated sales associates/representatives, which representatives are located throughout the United States, and certain of its Territories, but are and have been organized and trained, with the result that Freepoint is a highly effective marketing organization; ii) a lasting and sophisticated relationship with the Preferred Companies; and iii) the Customers particularly insofar as Freepoint receives its primary compensation from sales of Products and Services to such Customers. The Associate understands and acknowledges that the commissions the Associate earns from the sale of Products and Services constitute, in part, compensation for producing the property rights of Freepoint in its network of contractually affiliated sales associates/representatives and in the Products and Services sold by the Associate or his/her Downline Associates and for the Associate's agreement herein not to violate or interfere with such property rights and not to breach the covenants set forth below.

2. Customer Non-Replacement. Absent the issue of the then current suitability of the product for the Customer, the Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly, individually or in concert with another, induce or attempt to induce any Customer to terminate, reduce coverage under or replace any of the Products and Services which have been sold by the Associate or his/her Downline Associates, in this Section D, the term "Customer" shall be limited during the two (2) year period after the Termination to those Customers I) to whom the Associate or his/her Downline Associates sold Products and Services; and ii) who reside, at the time of the inducement or attempted inducement, in the geographical area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding Termination of this Agreement. The Associate understands and acknowledges that this Section D (2) is not a non-solicitation covenant; it is a non-replacement covenant. For purposes of this Agreement the Associate's office shall mean that office or offices from which the Associate, during the eighteen (18) month period preceding Termination of the Agreement, conducted his/her business operations as an Associate of Freepoint. The Associate agrees and acknowledges that a breach of the Associate's promise in this Section D (2) would constitute wrongful interference with contractual rights of Freepoint.

3. Associate Non-Recruitment. The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly, i) induce or attempt to induce any person who is contractually affiliated with Freepoint as an Associate or in other capacity, or any member of Freepoint's administrative staff, to terminate their relationship with Freepoint; or ii) hire, induce or attempt to hire or induce any such persons to sell or solicit products and services which are competitive with the Products and Services for any person or entity other than Freepoint. The Associate's covenants in the preceding sentence are limited and only apply with respect to any person that resided in or engaged in business activities in the geographic area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding Termination of this Agreement. The Associate acknowledges that any violation of this Section D (3) by the Associate with respect to any member of Freepoint's network of contractually affiliated sales associates/representatives constitute wrongful interference with Freepoint's contractual relationship with such persons and with Freepoint's and the Preferred Companies' administrative staffs.

4. Non-Disclosure Covenant. The Associate will not use, disseminate or reveal, other than on behalf of Freepoint as authorized by Freepoint or the Preferred Companies, while this Agreement is in force, or within two (2) years after Termination of this Agreement, any confidential information or trade secrets of Freepoint or of the Preferred Companies, which the Associate has or hereafter receives, including any Customer or list of Freepoint Associates, whether obtained from Freepoint or any other person, or compiled by or on behalf of the Associate; provided, however, that confidential information does not include information which becomes generally available to the public other than as a result of disclosure by the Associate or any member of Freepoint's network of contractually affiliated sales associates. The Associate agrees that immediately upon the Termination of this Agreement he/she will return all documents, files and lists containing any confidential information or trade secrets to Freepoint and the same shall not be copied or duplicated. For purposes of this Agreement the term "confidential information" means any and all confidential and proprietary data

7

Initials _____

and information created by or belonging to Freepoint which has value to and are not generally known by the competitors or potential competitors of Freepoint now or hereafter acquired or disclosed to the Associate.

5. Non-Solicitation. The Associate shall not, at any time during the term of this Agreement, directly or indirectly, individually or in concert with another, solicit or attempt to solicit, induce or attempt to induce any member of Freepoint's network of contractually affiliated sales associates/representatives to purchase any products and services other than the Products and Services.

6. Covenants of Other Associates and Harm to Freepoint. The Associate acknowledges that all members of Freepoint's network of contractually affiliated sales associates/representatives have executed agreements with Freepoint containing covenants identical or similar to the Covenants and that any act by the Associate to induce or attempt to induce any member to breach any portion of his/her agreement with Freepoint would constitute wrongful interference with the contractual rights of Freepoint with such member. The Associate acknowledges that Freepoint would suffer extremely costly and irreparable harm, loss and damage if, during the term of the Covenants, the Associate should violate any of said Covenants.

7. Equitable Relief. The Associate acknowledges and agrees that, in the event that he/she were to violate or threaten to violate any of the Covenants, Freepoint's recovery of damages would be inadequate to protect Freepoint. Accordingly, the Associate agrees that, in the event of a violation, actual or threatened, of any such Covenants, Freepoint shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary. The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons, the property rights of Freepoint which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected.

8. Reasonableness and Severability. The Associate acknowledges that the Covenants do not restrict the geographic areas in which the Associate may have Downline Associates and in which the Associate or such Downline Associates may solicit for the sale of Products and Services and that members of Freepoint's network of contractually affiliated sales associates/representatives frequently share offices with and have access to Customer information of other members, whether or not in the Associate's hierarchy. Accordingly, the Associate acknowledges and agrees that the Covenants would be reasonable even with a much broader geographical limitation. The Associate understands that these Covenants constitute consideration for all post-termination accrual or payment of any commissions, including Override Compensation. The Associate agrees that the Covenants are reasonable as to the Associate and necessary to protect the interest of Freepoint and that Freepoint would not associate with the Associate unless he/she entered into these Covenants. The Covenants and the acknowledgments and agreements contained in this Section D are severable and separate, and should a court determine any covenant or portion thereof to be unenforceable, it shall not affect the validity of any other paragraph of this Agreement or portion thereof. The Covenants and the acknowledgments and agreements in this Section D shall be construed as independent of any other provision in this Agreement, except (notwithstanding Article IX (G)) accrual and payment of commissions and Override Compensation. The existence of any other claim or cause of action of the Associate, whether predicated on this Agreement or otherwise, shall not constitute a defense to these Covenants or the acknowledgments.

9. Collateral Consequences. In addition to the rights Freepoint has to enforce the Covenants, the Associate agrees and understands that in the event of any breach by him/her of any of the Covenants or the provisions of this Section D, whether during the term of or after the Termination of this Agreement, no further commissions shall accrue or be payable to Associate by Freepoint, or shall be accrued or paid to reduce any Debit Balance, and any Debit Balance shall thereafter be immediately due and payable by the Associate. Compliance with each of the Covenants is an express condition for the accrual, earning or payment of any commissions and Override Compensation by Freepoint and the parties do not intend for any payment provisions under this Agreement to be enforceable by the Associate independent of his/her observance of these Covenants.

E. "Customers". Any person, or entity, from whom any member, solicits or attempts to solicit applications for Products and Services.

F. "Debit Balance". The balance remaining from time to time after subtracting the commissions and earned commissions actually earned but unpaid, which are due and payable by Freepoint to Associate, from any money and value owed (regardless of whether it is then due or not) by Associate to Freepoint, including but not limited to expenses; license fees; commissions, and expenses that Associate is required to refund to Freepoint because of Customer or Customer cancellations, rights of withdrawal, non-renewals, terminations, lapses or otherwise; Advance Commissions; Debit Balances of Associate's Downline Associate(s); expenses and fees incurred by Freepoint in attempting to register prospective Downline Associates of Associate; Freepoint claims for indemnification against Associate; and other claims by Freepoint against Associate; and any and all money and value which may be paid, advanced, or credited by or on behalf of Freepoint, or for the benefit of, Associate.

G. "Divesture". Notwithstanding anything in this Agreement to the contrary, the Associate forfeits his/her right to receive commissions if the Associate's Termination is "with Cause." Further, should Associate's Termination be with "without cause" but Associate subsequently violates or fails to comply with any promise, obligation, covenant, warranty or representation contained in this Agreement or in any Associate Agreement Guideline or Rule which survives the Termination of this Agreement, such violation or failure will result in the automatic forfeiture by Associate. Divestiture is at the sole discretion of Freepoint.

H. "Downline Associate". Any member of Freepoint upon whose sales, fees or revenue production Associate is entitled to earn Override Compensation.

I. "Good Faith Arbitration". The procedures set forth in this Section I to resolve all Grievances, unresolved in the normal course of business, to the extent that any Party wishes to pursue the matter further.

8

Initials _____

1. **General.** All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules, except that, or in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant associate, agent, registered representative, attorney or other representative of any insurance company, insurance broker or insurance agency, securities broker, securities dealer or mortgage company, investment advisor, or of any affiliate of any of them; ii) the Parties may be entitled to such discovery and protective orders as provided herein; iii) the locale where the arbitration shall be held is the principal head office of Freepoint in Scottsdale, Arizona or, if that location is not convenient for all Parties, they shall try to devise a way so that it is convenient, or if that location cannot be made convenient at such other place as the Parties may agree, or, if they cannot agree, then as may be set by the Rules, as the case may be: iv) a transcript shall be made on the proceeding; and v) the arbitrator's(s') award shall state their findings of fact and conclusions of law.

2. **Judicial Review** of Award. The award, including such findings and conclusions may be reviewed, vacated, modified or corrected upon application or petition of any Party brought within thirty (30) days after the date of the award, by a court of competent jurisdiction, provided that in addition to the grounds stated in applicable law or statute, the court may also vacate, modify or correct the award if the conclusions of law are contrary to law, or if the findings of fact are not supported by the facts (as determined by whether there was any pertinent and material evidence to support the findings). Otherwise, or in compliance with the court's review, the decision of the arbitrator(s) shall be final and binding. Judgment upon the award rendered by the arbitrator(s), or judgment upon the award as reviewed by the court, may be entered in any court having jurisdiction thereof.

3. **Discovery Protective Orders.** Discovery (in the form of production of documents and depositions) of evidence pertinent and material to the Grievance, may be ordered by the arbitrator(s). The discovery shall be on such terms and at such times and locations as ordered by the arbitrator(s) and their orders may be enforced by courts of competent jurisdiction. In connection with all discovery and hearings regarding Good Faith Arbitration, the Arbitrator(s) shall have the power to enter such protective orders as are proper under the circumstances, and the protective orders may be enforced by courts of competent jurisdiction

4. **Waiver of Litigation.** The Parties acknowledge and agree that, except as specifically provided to the contrary in this Agreement, this Section i is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof. It is the intent of the Parties that, except as specifically provided to the contrary in this Agreement, to the fullest extent allowed by law all Grievances, including any claims or defense (whether created or governed by federal, state or local law, rule or regulation) shall be resolved in an arbitral rather than a judicial forum. It is understood by the Parties that it is to their mutual benefit to submit Grievances that they are unable to resolve themselves for resolution by a neutral referee in an arbitral rather than a judicial forum. Those Parties recognize that by choosing Good Faith Arbitration as the mechanism for resolving Grievances, each Party expects to ensure a more expeditious and economical resolution of their Grievances than is available in most cases in a judicial forum. Accordingly, except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury. The Parties further agree that the findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

5. **No Condition Precedent to Action and Power of Arbitrators.** Anything herein or elsewhere contained to the contrary notwithstanding, Freepoint shall not be required to negotiate, arbitrate or litigate as a condition precedent to taking any action under this Agreement. The Parties expressly authorize the arbitrator(s) to fashion and award any type of remedy that could be awarded by a court, including such equitable or extraordinary remedies as temporary and permanent injunctive relief.

6. **Extraordinary Relief.** The Parties agree that Freepoint has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Article VI of this Agreement without complying with Article V of the Agreement or this Section I. Without limitation, the Parties agree that the requirements for Good Faith Arbitration under Article V of the Agreement or this Section do not preclude Freepoint from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Article VI of the Agreement. Neither Article V of the Agreement or this Section I shall be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

7. **Statute of Limitations.** Unless otherwise tolled or satisfied with respect to Good Faith Arbitration, a demand for arbitration must be filed under the Rules within the time prescribed by the applicable statutes of limitations.

8. **Beneficiaries.** The Associate and Freepoint intend and agree that all of the Corporate People shall be Beneficiaries of all of the provisions of this Section I and that as Beneficiaries and as Parties, they, or any of them shall have the right to enforce all provisions of this Section I to the same extent as Freepoint and the Associate.

J. **"Grievance".** Any controversy, claim or dispute arising out of or relating to this Agreement, between the Associate, on the one part, and Freepoint and/or any of the Corporate People, or any of them, on the other part.

K. **"Indemnified Losses".** Any and all liability, claims, demands, proceedings, obligations, assessments, loss, cost, damage and expense, of any nature whatsoever, contingent or otherwise (including, without limitation, any and all judgments, decrees, equitable relief, extraordinary relief, settlements, awards, attorney's fees, court costs, punitive damage and arbitration costs including arbitrators' fees).

L. **"Indemnified Party".** Freepoint including the Freepoint Affiliates and the Corporate People.

M. **"Override Compensation".** Those commissions that are earned by an Associate from sales of Products and Services made by other Freepoint Associates and those commissions that are earned by a Associate from sales of products and services made by sales representatives or contractors, in

9

accordance with commission schedules, rules and regulations issued by Freepoint from time to time. Override Compensation is earned only by the faithful performance of Associate's obligations under this Agreement, including, but not limited to, those obligations relating to Associate's Downline Associates.

N. "Parties". Freepoint, the Associate and the Corporate People.

O. "Preferred Companies". Those companies with whom Freepoint has established a contractual relationship authorizing associates of Freepoint to solicit sales of Products and Services for such companies.

P. "Products and Services". Those products and services selected, approved and designated from time to time by Freepoint for which Associate may solicit applications

Q. "Prohibited Actions". Associate is prohibited from, and agrees that Associate shall not: i) collect from Customers, in payment of the purchase of Products and Services, cash, or checks made payable other than to the appropriate Preferred Company, custodian bank or transfer agent relating to such purchases, all as designated by Freepoint; ii) offer to sell any products and services unless such are Products and Services, except as otherwise expressly set forth in this Agreement; iii) offer or sell any Products and Services unless there exists at the time of such offer or sale an effective agreement between Freepoint and the Preferred Company, if any, making available such services; iv) make, alter or discharge on behalf of Freepoint any contract or investment or waive any provision other than in strict compliance with the terms and conditions of all applicable laws and in accordance with this Agreement and the procedures, manuals, guidelines, rules and regulations with this Agreement and of Freepoint; or v) make any misrepresentation, or improperly induce a Customer to purchase Products and Services.

R. "Roll Up". The transfer, with recourse, of the Debit Balance of a Downline Associate to that Downline Associate's above Upline Associates. The term Roll Up includes the transfer, with recourse, from a Downline Associate to Associate, and also from Associate to Upline Associates. The formula and procedure for "Roll Ups" are more specifically set out in Associate Agreement Rules.

S. "Rules". Where required to be applied, the Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance.

T. "Termination". The occurrence of any of the following: i) the automatic termination, without notice, upon: the death of Associate; or the revocation, termination or non-renewal of any of the Associate's licenses and registrations with any regulatory agencies; ii) the termination by Associate at any time, without any reason or any cause, effective upon the delivery of written notice to Freepoint, or iii) if Associate fails to achieve and/or maintain a personal commission level of $5,000.00 or more for the first full calendar year of membership, or any calendar year thereafter, Freepoint shall have the right to terminate this Agreement, or iv) the termination by Freepoint at any time for "cause", effective upon the delivery of written notice to Associate. For purposes of this Agreement, Associate agrees and acknowledges that any of the following will be "cause" for termination of this Agreement by Freepoint: Associate's violation of any federal or state law or regulation; Associate becomes subject to sanctions or censure by any state or federal regulatory agency or body; Associate becomes temporarily or permanently enjoined from acting as a sales associate of Freepoint or conducting his/her business or performing any of his or her duties under this Agreement or from acting in any of the various capacities relating to the insurance or financial services business; Associate is censured, suspended or disciplined in respect to the violation of any law, rule, or regulation regarding the purchase or sale of any products and services, including the Products and Services; misappropriation or commingling of premiums or payments for any Products and Services; engaging in a fraudulent act or misrepresenting characteristics or benefits of the Products and Services; any interference with the collection of renewal premiums; Associate violates any law or regulation that governs the conduct of any part of Associate's business; Associate is indicted or subject to trial for any crime involving moral turpitude; Associate breaches any provision of or fails to perform or observe any obligation under this Agreement or any other agreement that the Associate may have, now or hereafter, as a member of World Financial Group; Associate fails to timely discharge any monetary obligations to Freepoint; Associate engages in any activity which, in the sole opinion of Freepoint, may adversely affect the good name and reputation of Freepoint; Associate's failure to comply with the procedures, manuals, rules, and regulations promulgated from time to time by Freepoint, including the Associate Agreement Rules; any false or incorrect statements made by Associate in any application to a regulatory authority; termination for any reason of any agreement between Associate and any of Preferred Company; or the failure of Associate to comply with Freepoint's annual compliance review and review procedure. At Freepoint's discretion, instead of immediately terminating this Agreement, Freepoint may impose suspension of Associate's benefits and rights and privileges, including suspension of rights to solicit for Products and Services and suspension and loss of commissions, and may impose other disciplinary action, without liability to Associate for loss or otherwise. Suspension or disciplinary action shall not in any way preclude or diminish Freepoint's rights to terminate this Agreement at any time. In the event of termination of this Agreement by either party, Freepoint shall be entitled to notify the Preferred Companies to terminate the Associate's contract(s) if any, with the Preferred Companies, and Associate acknowledges and agrees that neither Freepoint nor the Preferred Companies shall have any liability for any loss, damage or otherwise resulting from such termination by the Preferred Companies or notice from Freepoint.

U. "Upline Associate". Any Associate of Freepoint entitled to earn Override Compensation upon the sales activities of Associate.

W. "Vested". The right of Associate to receive commissions and Override Compensation after Termination of this Agreement, unless and until Divestiture occurs. If Associate becomes Vested, then, in the event that this Agreement terminates due to Associate's death, Freepoint shall pay the commissions and Override Compensation to Associate's estate or, if specifically designated in writing by Associate, to Associate's surviving spouse.

X. "Freepoint Affiliate". Any legal entity, which is under common control with Freepoint.

10

Initials_____

*Scott Gilbert*

Steps to Start Enrollment for Freepoint

- Note: All of the following steps can be done prior to resigning from current Broker Dealer and Marketing Company.
- You want to be signed up to sell Allianz fixed products while is transition with your U4/U5 so it is important to do the following steps prior to submitting for resignation with WFG WGS. You can sign up to sell Allianz fixed products through a marketing organization and Freepoint is a marketing field organization. This is noted as an outside business activity with WGS, so an OBA form should be filled out with BOM if the transition will take a while due to personal desire to wait for current or past commissions to be paid through WFG. If you decide to stay with WFG/WGS, you can still be appointed as an OBA with Freepoint and Allianz because of the above statements.

1. Fill out Associate Membership Agreement for Freepoint
   A. Initial each page in the right bottom corner of pages 1-10
   B. Print and sign name on page 6
2. Fill out Freepoint Appointment Application Associate Information
   A. Sign name
   B. Have leader sign name
   C. 5 personal references to be called by Freepoint
3. Fill out Freepoint Credit Card Agreement
   A. Visa or Master Card
   B. Sign paper authorization
   C. Billed for $100 without Life/Health Licenses prior to enrollment
      - Business Cards
      - Background Check
      - Study Materials for Life/Health Test
   D. Billed for $50 with Life/Health Licenses prior to enrollment
      - Business Cards
      - Background Check
4. Fill out W-9 Agreement for Taxpayers
5. Fill out Pre-hire Consent Form will US Allianz Securities
   A. Fax to #763-765-7120
   B. Sign it and fill out all information (might want to add your personal email address)
   C. Allianz will contact you (or Freepoint, and then Freepoint will contact you) to give you their website address.
      - You will log-on to their website
      - Fill out their U4
      - They'll send you a packet within 3-4 days for you to fill out as their hiring packet
      - You will fill out the packet and mail it back to them
      - Also fill out the Application for Agent Agreement and send to them
      - They will monitor the NASD website for your U5 to switch over your licenses to Allianz from WGS
      - The packet they send you will also include the fees for the already licensed agents who need to request a U5 and transfer their licenses to Allianz in various states. Costs vary and are state specific.
   D. Send letter of resignation to World Financial Group and to World Group Securities. You may use the standard one that is provided. The letter will request the U5

Date


Licensing Department
World Group Securities
11315 Johns Creek Parkway
Duluth, GA 30097

Re:     Resignation



Dear Sirs,

I would like to submit my resignation from World Group Securities and World Financial Group with immediate effect. Please process my resignation with the NASD as soon as possible and forward the U-5 to the address shown below.

Yours sincerely,



Andraya Carson
Agent Code #146 QG


Miss Andraya Carson
4909 West Joshua Blv. #2006
Chandler, Az 85226

## WFG - A different kind of Company for a Different Kind of Consumer



**About WFG :**

· **About WFG**
· **WFG-By the Num**
· **Leadership**

World Financial Group is one of the few companies of its kind in the industry today – a **marketing company** that is dedicated to serving the financial needs of individuals and families from all walks of life.

World Financial Group's independent associates do not just work with clients who have large amounts of discretionary income – instead they work with everyday people helping them make critical financial decisions that help move them from where they are to where they want to be.

WFG associates are committed to:

- Helping individuals and families who are overlooked by other companies in the financial services industry.
- Working with clients to create a strategy to protect themselves and their families if they live too long or die too soon.
- Educating individuals, families and business owners that financial decisions made today are critical in determining their financial futures.

### Choice Makes the Difference
Unlike other insurance and financial services companies that offer products and services from a single provider, World Financial Group associates represent a number of the industry's **leading companies**, not just one, to the consumer. This approach helps WFG associates find the product that fits you and **your needs**, rather than fitting you into a product.

WFG clients can choose products from more than 100 insurance and investment companies[1,2,3] so you can find the product that is right for you. Whether you are looking for insurance or mutual funds[1] IRAs[1,2] or other financial products, your WFG associate may be the one stop for all of your financial needs.

### WFG: In Your Neighborhood
Each WFG associate is an independent business owner that operates in the local community. So with World Financial Group, you're never a number, but a valued neighbor your local associate is eager to help. To find a WFG associate in your area, **click here»**

1. Though this material is intended for informational purposes only and is not intended to, nor should it be, construed as an offer or solicitation for or sale of any specific securities, financial services or other non-specified item, please be aware that securities products are sold by prospectuses, more information about the product's fees, charges and limitations. Only those WFG Associates who are actively registered with World Group Sec offer securities-related products. In the future, should you decide to invest, be certain to perform a thorough review of the entire prospectus. His performance does not guarantee future investment results.

2. Insurance products are offered through World Financial Group Insurance Agency, Inc. (WFGIA).
WFG, WGS, and WFGIA are affiliated companies.

World Financial Group, Inc. (WFG or World Financial Group) is an independent marketing company whose affiliates offer life insurance and a broa financial products and services.

Securities are offered through **World Group Securities, Inc.** (WGS or World Group Securities), Member NASD/SIPC.

Insurance products are offered through World Financial Group Insurance Agency, Inc. (WFGIA). WFG, WGS, WFGIA are affiliated companies.

Headquarters: 11315 Johns Creek Parkway, Duluth, GA 30097-1517.Phone: 770.453.9300.

© World Financial Group, Inc. 2003

**Copyright & Legal Information**
World Financial Group, Inc. and World Group Securities, Inc., and their affiliated companies, provide this site and related services subject to your the terms and conditions set forth below. Please read the following information carefully:

**1. Copyright Information.**
All pages within this Internet site ("Site") are the property of World Financial Group, Inc. (WFG) and/or its affiliates. No portion of the materials o may be reprinted or republished in any form without the express written permission of WFG.

**2. Trademark Notice.**
WFG and WGS's logos are trademarks and service marks of WFG and WGS. All other trademarks, service marks and logos used in this Site are th service marks or logos of their respective owners.

**3. Warranty Disclaimer.**
This site, including any content or information contained within it or any Site-related service, is provided "as is" with no representations or warrar kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability, fitness for a particular purpose, and nor You assume total responsibility and risk for your use of this Site and Site-related services. WFG, its affiliates and its sponsors are neither respons for any direct, indirect, incidental, consequential special, punitive, exemplary or other damages arising out of or relating in any way to the Site, S services and/or content or information contained within the Site. Your sole remedy for dissatisfaction with the Site and/or Site-related services is the Site and/or those services. Although WFG attempts to ensure the integrity and accuracy of the Site, they make no guarantees whatsoever as correctness or accuracy of the Site. It is possible that the Site could include inaccuracies or errors, and that unauthorized additions, deletions and could be made to the Site by third parties. In the event that an inaccuracy arises, please inform WFG so that it can be corrected.

**4. Miscellaneous.**
This Agreement is entered into in the State of Georgia and shall be governed by and construed in accordance with the laws of the State of Georgi its choice of law rules. Each party to this Agreement submits to the exclusive jurisdiction of the state and federal courts sitting in the County of F State of Georgia, and waives any jurisdictional, venue, or inconvenient forum objections to such courts. In any action to enforce this Agreement, party will be entitled to costs and attorneys fees. In the event that any of the provisions of this Agreement are held by a court or other tribunal o jurisdiction to be unenforceable, such provisions shall be limited or eliminated to the minimum extent necessary so that this Agreement shall othe full force and effect. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and an or oral agreements heretofore existing between the parties hereto are expressly canceled. WFG may modify the terms of this Agreement by posti such modification on a page of the Site entitled "Legal Notices" or "Legal Information" (or similar title) before the modification takes place.

## WFG Services: The Need Exists



Although we live in the Information Age, the lack of education about financial concepts is astonishing. People know they need to take steps to save for retirement, plan for life's emergencies and save for major expenses like college and buying a home – but they simply don't do it because they don't know how or where to start.

**What We Offer:**

· **Financial Solution**
· **Business Opportu**
  · **WFG Services**
  · **The WFG Diffe**
  · **A New World o**
    **Opportunity**

Consider these facts:

- The U.S. Government estimates the Social Security program will experience permanent cash deficits beginning in 2017,[1] when many Baby Boomers will begin retirement.
- The median income reported by older Americans in 2000 was $13,769. [2]
- Only 4 percent of retirees have saved enough and have enough income to have achieved financial independence. [3]
- *35 percent of workers ages 20 to 39 believe they are on track in planning and saving for retirement. However, of this same group, 43 percent have less than $10,000 in retirement savings and 58 percent have saved less than $25,000.* [4]

As you can see, a tremendous need exists for financial education and assistance. As a World Financial Group associate, you can help be part of the solution. You can learn how to help people just like you get on track to their financial goals and better prepare for their future.

WFG offers you a variety of **resources and services** to help you build a successful business, while letting you be in the driver's seat.

1 Interim Report, The President's Commission to Strengthen Social Security, August 2001.

2 A Profile of Older Americans 2001, Administration on Aging, U.S. Dept. of Health and Human Services.

3 The 2000 Retirement Confidence Survey, American Savings Education Council, Employee Benefit Research Institute, and Mathew Greenwald & As

4 The 2002 Retirement Confidence Survey, Employment Benefit Research Institute, American Savings Education Council, and Mathew Greenwald &

World Financial Group, Inc. (WFG or World Financial Group) is an independent marketing company whose affiliates offer life insurance and a broa financial products and services.

Securities are offered through **World Group Securities, Inc.** (WGS or World Group Securities), Member NASD/SIPC.

Insurance products are offered through World Financial Group Insurance Agency, Inc. (WFGIA). WFG, WGS, WFGIA are affiliated companies.

Headquarters: 11315 Johns Creek Parkway, Duluth, GA 30097-1517.Phone: 770.453.9300.

© World Financial Group, Inc. 2003

**Copyright & Legal Information**
World Financial Group, Inc. and World Group Securities, Inc., and their affiliated companies, provide this site and related services subject to your the terms and conditions set forth below. Please read the following information carefully:

**1. Copyright Information.**
All pages within this Internet site ("Site") are the property of World Financial Group, Inc. (WFG) and/or its affiliates. No portion of the materials o may be reprinted or republished in any form without the express written permission of WFG.

**2. Trademark Notice.**
WFG and WGS's logos are trademarks and service marks of WFG and WGS. All other trademarks, service marks and logos used in this Site are th service marks or logos of their respective owners.

**3. Warranty Disclaimer.**
This site, including any content or information contained within it or any Site-related service, is provided "as is" with no representations or warrar kind, either expressed or implied, including, but not limited to, the implied warranties of merchantability, fitness for a particular purpose, and nor You assume total responsibility and risk for your use of this Site and Site-related services. WFG, its affiliates and its sponsors are neither respons for any direct, indirect, incidental, consequential special, punitive, exemplary or other damages arising out of or relating in any way to the Site, S services and/or content or information contained within the Site. Your sole remedy for dissatisfaction with the Site and/or Site-related services is the Site and/or those services. Although WFG attempts to ensure the integrity and accuracy of the Site, they make no guarantees whatsoever as correctness or accuracy of the Site. It is possible that the Site could include inaccuracies or errors, and that unauthorized additions, deletions and

could be made to the Site by third parties. In the event that an inaccuracy arises, please inform WFG so that it can be corrected.

**4. Miscellaneous.**
This Agreement is entered into in the State of Georgia and shall be governed by and construed in accordance with the laws of the State of Georgi
its choice of law rules. Each party to this Agreement submits to the exclusive jurisdiction of the state and federal courts sitting in the County of Fu
State of Georgia, and waives any jurisdictional, venue, or inconvenient forum objections to such courts. In any action to enforce this Agreement,
party will be entitled to costs and attorneys fees. In the event that any of the provisions of this Agreement are held by a court or other tribunal of
jurisdiction to be unenforceable, such provisions shall be limited or eliminated to the minimum extent necessary so that this Agreement shall othe
full force and effect. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and an
or oral agreements heretofore existing between the parties hereto are expressly canceled. WFG may modify the terms of this Agreement by posti
such modification on a page of the Site entitled "Legal Notices" or "Legal Information" (or similar title) before the modification takes place.

# The Freepoint Vision

Freepoint is a different kind of company in the financial services industry today – a marketing company that is dedicated to serving the financial needs of individuals and families from all walks of life. Freepoint's Wealth Planners do not just work with clients who have large amounts of discretionary income – instead they work with everyday people helping them make critical financial decisions that help move them from where they are to where they want to be.

Freepoint Planners are committed to:

- Helping individuals and families who have been overlooked by other companies in the financial services industry.
- Working with clients to create a strategy to protect themselves and their families if they live too long or die too soon.
- Educating individuals, families and business owners that financial decisions made today are critical in determining their financial futures.

Although we live in the Information Age, the lack of education about financial concepts is astonishing. People know they need to take steps to save for retirement, plan for life's emergencies and save for major expenses like college and buying a home – but they don't know how or where to start.

Consider these facts:

- The U.S. Government estimates the Social Security program will experience permanent cash deficits beginning in 2017, when many Baby Boomers will begin retirement.
- The median income reported by older Americans in 2000 was $13,769.
- Only 4 percent of retirees have saved enough and have enough income to have achieved financial independence.
- 35 percent of workers ages 20 to 39 believe they are on track in planning and saving for retirement. However, of this same group, 43 percent have less than $10,000 in retirement savings and 58 percent have saved less than $25,000.

A tremendous need exists for financial education and assistance. As a Freepoint Wealth Planner, you can help be part of the solution. You can learn how to help people just like you get on track to their financial goals and better prepare for their future.

Unlike other insurance and financial services companies that offer products and services from a single provider, Freepoint Wealth Planners represent a number of the industry's leading companies not just one, to the consumer. This approach helps Freepoint find the product that fits your needs, rather than fitting you into a product.

Freepoint offers products from multiple financial services companies so you can find the product that is right for you. Whether you want to buy or refinance your house, are looking for a specific type of insurance program, need to plan for your retirement or want to educate your children, Freepoint is able to be the single source for all of your financial needs.

Freepoint was founded to change the financial lives of its customers. We focus on everyone, also those that in the past have been ignored by the rest of the financial services industry. We assist and educate people from all walks of life on how money works. Freepoint teaches people how to retain some of the millions that we all handle in the course of our lifetime. We show them how to reach the point when they can be financially free...their Freepoint.

We are constantly looking for good people that share this vision and that would like to become a pioneer in what is a true revolution in the financial services industry. If you would like to find out more about how to develop your career in this industry, or know of anyone else that might be interested, please contact one of our Wealth Planners who can discuss this opportunity in more detail with you.



WORLD FINANCIAL
G R O U P ™
A Member of the AEGON Group

---

## VIA FEDERAL EXPRESS

November 21, 2003

Colin Buckingham
1723 W. Blue Ridge Way
Chandler, Arizona 85248

    Re:    <u>CEASE AND DESIST</u>

Dear Mr. Buckingham:

The purpose of this letter is to advise you that World Financial Group, Inc. ("WFG") has received information evidencing violations of specific obligations under your Associate Membership Agreement ("AMA").

As you are aware, one of the duties you agreed to under Section II of your AMA was that you "shall not violate the Covenants". The Covenants are set forth in the "Glossary and Explanation of Terms," which were explicitly made part of your AMA. Although the Covenants reference "WMA", WFG maintains, among other things, all enforcement rights on these Covenants. The Covenants are as set forth below, in relevant part:

### 2.    Customer Non-Replacement

"The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly, individually or in concert with another, induce or attempt to induce any Customer to terminate, reduce coverage under or replace any of the Products and Services which have been sold by the Associate or his/her Downline Associates. In this Section D the term "Customer" shall be limited during the two (2) year period after the termination of this Agreement to those Customers (i) to whom the Associate or his/her Downline Associates sold Products and Services; and (ii) who reside, at the time of the inducement or attempted inducement, in the geographical area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. . . . ."

---

Colin Buckingham
Re: CEASE AND DESIST
November 21, 2003
Page 2

### 3. Associate Non-Recruitment

"The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly: (i) induce or attempt to induce any person who is contractually affiliated with WMA as an Associate or in other capacity, or any member of WMA's administrative staff, to terminate their relationship with WMA; or (ii) hire, induce or attempt to hire or induce any such persons to sell or solicit products and services which are competitive with the Products and Services for any person or entity other than WMA. The Associate's covenants in the preceding sentence are limited and only apply with respect to any person that resided in or engaged in business activities in the geographic area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. The Associate acknowledges that any violation of this section D(3) by the Associate with respect to any member of WMA's network of contractually affiliated sales associates/representatives constitutes wrongful interference with WMA's contractual relationship with such persons and with WMA's and the Preferred Companies' administrative staffs."

### 4. Non-Disclosure Covenant

"The Associate will not use, disseminate or reveal, other than on behalf of WMA as authorized by WMA or the Preferred Companies, while this Agreement is in force, or within two (2) years after Termination of this Agreement, any confidential information or trade secrets of WMA or of the Preferred Companies, which the Associate has or hereafter receives, including any Customer or list of WMA Associates, whether obtained from WMA or any other person, or compiled by or on behalf of the Associate; . . . The Associate agrees that immediately upon the Termination of this Agreement he/she will return all documents, files and lists containing confidential information or trade secrets to WMA and the same shall not be copied or duplicated."

### 6. Covenants of Other Associates and Harm to WMA

"The Associate acknowledges that all members of WMA's network of contractually affiliated sales associates/representatives have executed agreements with WMA containing covenants identical or similar to the Covenants and that any act by the Associate to induce or attempt to induce any member to breach any portion of his/her agreement with WMA would constitute wrongful interference with the contractual rights of WMA with such member. The Associate acknowledges that WMA would suffer extremely costly and irreparable harm, loss and damage if, during the term of the Covenants, the Associate should violate any of said covenants."

Colin Buckingham
Re: CEASE AND DESIST
November 21, 2003
Page 3

WFG has received credible information revealing you have violated some or all of the above Covenants. As a result, you have forfeited any vesting rights within your AMA. In addition, you are ordered to immediately cease and desist from engaging in any and all such conduct. WFG has initiated an investigation surrounding your conduct and reserves the right to seek further additional relief based on your violative conduct to date and any future violative conduct by you.

Sincerely,

Scott W. Ham
General Counsel
WORLD FINANCIAL GROUP, INC.



**WORLD FINANCIAL**
**G R O U P** ™
A Member of the AEGON Group

---

**VIA FEDERAL EXPRESS**

November 14, 2003

Steven Rix
207 N. Gilbert Road
Suite 210-F
Gilbert, Arizona 85234

Re:   CEASE AND DESIST

Dear Mr. Rix:

The purpose of this letter is to advise you that World Financial Group, Inc. ("WFG" has received information evidencing violations of specific obligations under your Associate Membership Agreement ("AMA")

As you are aware, one of the duties you agreed to under Section II of your AMA was that you "shall not violate the Covenants". The Covenants are set forth in the "Glossary and Explanation of Terms," which were explicitly made part of your AMA. Although the Covenants reference "WMA", WFG maintains, among other things, all enforcement rights on these Covenants. The Covenants are as set forth below, in relevant part.

**2.     Customer Non-Replacement**

"The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly, individually or in concert with another, induce or attempt to induce any Customer to terminate, reduce coverage under or replace any of the Products and Services which have been sold by the Associate or his/her Downline Associates. In this Section D the term "Customer" shall be limited during the two (2) year period after the termination of this Agreement to those Customers (i) to whom the Associate or his/her Downline Associates sold Products and Services; and (ii) who reside, at the time of the inducement or attempted inducement, in the geographical area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. . . . ."

---

Steven Rix
Re: CEASE AND DESIST
November 14, 2003
Page 2

### 3. Associate Non-Recruitment

"The Associate covenants that he/she will not, at any time during the term of this Agreement, and for a period of two (2) years thereafter, directly or indirectly: (i) induce or attempt to induce any person who is contractually affiliated with WMA as an Associate or in other capacity, or any member of WMA's administrative staff, to terminate their relationship with WMA; or (ii) hire, induce or attempt to hire or induce any such persons to sell or solicit products and services which are competitive with the Products and Services for any person or entity other than WMA. The Associate's covenants in the preceding sentence are limited and only apply with respect to any person that resided in or engaged in business activities in the geographic area within fifty (50) miles of the location of the Associate's office(s) during the eighteen (18) month period preceding termination of this Agreement. The Associate acknowledges that any violation of this section D(3) by the Associate with respect to any member of WMA's network of contractually affiliated sales associates/representatives constitutes wrongful interference with WMA's contractual relationship with such persons and with WMA's and the Preferred Companies' administrative staffs."

### 4. Non-Disclosure Covenant

"The Associate will not use, disseminate or reveal, other than on behalf of WMA as authorized by WMA or the Preferred Companies, while this Agreement is in force, or within two (2) years after Termination of this Agreement, any confidential information or trade secrets of WMA or of the Preferred Companies, which the Associate has or hereafter receives, including any Customer or list of WMA Associates, whether obtained from WMA or any other person, or compiled by or on behalf of the Associate; . . . The Associate agrees that immediately upon the Termination of this Agreement he/she will return all documents, files and lists containing confidential information or trade secrets to WMA and the same shall not be copied or duplicated."

### 6. Covenants of Other Associates and Harm to WMA

"The Associate acknowledges that all members of WMA's network of contractually affiliated sales associates/representatives have executed agreements with WMA containing covenants identical or similar to the Covenants and that any act by the Associate to induce or attempt to induce any member to breach any portion of his/her agreement with WMA would constitute wrongful interference with the contractual rights of WMA with such member. The Associate acknowledges that WMA would suffer extremely costly and irreparable harm, loss and damage if, during the term of the Covenants, the Associate should violate any of said covenants."

Steven Rix
Re: CEASE AND DESIST
November 14, 2003
Page 3

WFG has received credible information revealing you have violated some or all of the above Covenants and, in addition, have violated the provisions of Rule 5. By violating said Covenants and Rule 5, WFG has terminated your AMA for cause and you have forfeited any and all vesting. You are ordered to immediately cease and desist from engaging in any and all such conduct. WFG has initiated an investigation surrounding your conduct and reserves the right to seek further additional relief based on your violative conduct to date and any future violative conduct by you

Sincerely,

Scott W. Ham
General Counsel
WORLD FINANCIAL GROUP, INC.

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN ... OFFICE

FEB 27 2004

LUTHER ...
By: _____ ... Clerk
Deputy Clerk

WORLD FINANCIAL GROUP, INC., )
                              )
        Plaintiff,            )
                              )
v.                            )     CIVIL ACTION
                              )     FILE NO.: _____
FREEPOINT, LLC; FREEPOINT     )     1 04-CV 0553
WEALTH MANAGEMENT INC.;       )
COLIN BRIAN BUCKINGHAM;       )
STEVEN EDWARD RIX; and DOES   )     CAP
1-10                          )
                              )
        Defendants.           )
_____)

STATE OF GEORGIA

COUNTY OF FULTON

## VERIFICATION OF COMPLAINT

Personally appeared before the undersigned party authorized to administer

oaths, Susan Davies, Vice President of World Financial Group, Inc., who states

under oath that World Financial Group, Inc. is the Plaintiff named in the above-

styled action and that the facts contained in the Complaint are true and correct to

the best of her knowledge and belief.

This _25_ day of February, 2004.

_Susan Davies_ *(signature)*

Susan Davies

Sworn and subscribed before me
this _25_ day of February, 2004.

_Christina S Downum_ *(signature)*

Notary Public
My commission expires: _May 2, 2004_

*(Notary seal: CHRISTINA S. DOWNUM, NOTARY PUBLIC, GEORGIA, EXPIRES MAY 2, 2004, GWINNETT COUNTY)*

AO 440 (Rev. 5/85) Summons in a Civil Ac.

# United States District Court

### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

WORLD FINANCIAL GROUP, INC.,

      Plaintiff,

                V.

FREEPOINT, LLC; FREEPOINT WEALTH
MANAGEMENT INC.; COLIN BRIAN
BUCKINGHAM; STEVEN EDWARD NIX;
and DOES 1-10

      Defendants.

## SUMMONS IN A CIVIL ACTION

CASE NUMBER: **1** 04-CV 0553

**To:**   Freepoint, LLC
       c/o Colin Buckingham
       1723 W. Blue Ridge Way
       Chandler, Arizona 85248

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

SCOTT M. RATCHICK
Hunton & Williams
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 4100
Atlanta, Georgia  30308

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the
complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS
CLERK

                       FEB 2 7 2004
                       DATE

BY DEPUTY CLERK

AO 440 (Rev. 5/85) Summons in a Civil Ac.

## RETURN OF SERVICE

| | |
|---|---|
| Service of the Summons and Complaint was made by me | DATE |
| Name of Server | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the defendant.  Place where served: _____

_____

☐   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left:

_____

☐   Returned unexecuted:

_____
_____
_____

☐   Other (specify):

_____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.


Executed on _____

_____        _____
            Date                                Signature of Server




_____        _____
                                                Address of Server

AO 440 (Rev. 5/85) Summons in a Civil Ac..

# United States District Court

### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

WORLD FINANCIAL GROUP, INC.,

    Plaintiff,

## SUMMONS IN A CIVIL ACTION

          V.

CASE NUMBER:

FREEPOINT, LLC; FREEPOINT WEALTH
MANAGEMENT INC.; COLIN BRIAN
BUCKINGHAM; STEVEN EDWARD NIX;
and DOES 1-10

**1 04-CV** 0⸓55

    Defendants.

**To:**    Freepoint Wealth Management Inc.
        c/o Colin Buckingham
        1723 W. Blue Ridge Way
        Chandler, Arizona 85248

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

        SCOTT M. RATCHICK
        Hunton & Williams
        Bank of America Plaza
        600 Peachtree Street, N.E.
        Suite 4100
        Atlanta, Georgia  30308

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

_____
CLERK

_____
BY DEPUTY CLERK

FEB 2 7 2004
_____
DATE

AO 440 (Rev. 5/85) Summons in a Civil Ac..

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me | DATE |
|---|---|
| Name of Server | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the defendant.  Place where served: _____

_____

☐   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left:

_____

☐   Returned unexecuted:

_____
_____

☐   Other (specify):

_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____

| _____ | _____ |
|---|---|
| Date | Signature of Server |

| _____ |
|---|
| Address of Server |

AO 440 (Rev. 5/85) Summons in a Civil Act.

# United States District Court

### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

WORLD FINANCIAL GROUP, INC.,

    Plaintiff,

             V.

FREEPOINT, LLC; FREEPOINT WEALTH
MANAGEMENT INC.; COLIN BRIAN
BUCKINGHAM; STEVEN EDWARD NIX;
and DOES 1-10

    Defendants.

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

**1 04-CV U553**

**To:**    Colin Brian Buckingham
        1723 W. Blue Ridge Way
        Chandler, Arizona 85248

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

        SCOTT M. RATCHICK
        Hunton & Williams
        Bank of America Plaza
        600 Peachtree Street, N.E.
        Suite 4100
        Atlanta, Georgia  30308

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the
complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

                                FEB     2004

                                DATE

BY DEPUTY CLERK

AO 440 (Rev. 5/85) Summons in a Civil Act.

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and Complaint was made by me | DATE | |
| Name of Server | TITLE | |

Check one box below to indicate appropriate method of service

☐    Served personally upon the defendant. Place where served: _____

☐    Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left:

☐    Returned unexecuted:

☐    Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____

_____
       Date                 Signature of Server

_____
                Address of Server

61657.000013 ATLANTA 478376v1

AO 440 (Rev. 5/85) Summons in a Civil Action

# United States District Court

## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WORLD FINANCIAL GROUP, INC.,

     Plaintiff,

## SUMMONS IN A CIVIL ACTION

          V.

CASE NUMBER:

FREEPOINT, LLC; FREEPOINT WEALTH
MANAGEMENT INC.; COLIN BRIAN
BUCKINGHAM; STEVEN EDWARD NIX;
and DOES 1-10

**1 04-CV 0553**

     Defendants.

**To:**   Steven Edward Rix
        207 N. Gilbert Road
        Suite 210-F
        Gilbert, Arizona 85234

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

        SCOTT M. RATCHICK
        Hunton & Williams
        Bank of America Plaza
        600 Peachtree Street, N.E.
        Suite 4100
        Atlanta, Georgia 30308

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS
CLERK

FEB 27 2004

DATE

BY DEPUTY CLERK

AO 440 (Rev. 5/85) Summons in a Civil Ac.

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and Complaint was made by me | DATE |
| Name of Server | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the defendant.  Place where served: _____

☐   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐   Returned unexecuted:

☐   Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |
| DECLARATION OF SERVER | | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____

_____
Date                    Signature of Server

_____
Address of Server